---

Page 1

```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

                         Civil Action No. 04-30172-MAP

ROBERT DADE,
                 Plaintiff,

vs.

BOLAND BUILDERS, INC., THOMAS
M. BOLAND, STUART JONES AND
MARY ROSE JONES,
                 Defendants.

     DEPOSITION OF: THOMAS BOLAND, called by
counsel for the Plaintiff, taken pursuant to the
Federal Rules of Civil Procedure before Leigh B.
Gershowitz, Certified Shorthand Reporter, Registered
Merit Reporter, Certified Realtime Reporter and
Notary Public, at the Offices of O'Connell, Flaherty
& Attmore, 1350 Main Street, Springfield,
Massachusetts, on Friday, October 21, 2005,
commencing at 2:00 p.m.

APPEARANCES:

     See Page 2




              Leigh B. Gershowitz, CSR, RMR, CRR
                Certified Shorthand Reporter
                  Registered Merit Reporter
                  Certified Realtime Reporter
```

---

Page 2

**APPEARANCES:**

**FOR THE PLAINTIFF:**

O'CONNELL, FLAHERTY & ATTMORE
1350 Main Street
Springfield, Massachusetts 01103
(413) 747-1773
BY: JOHN A. CVEJANOVICH, ESQUIRE

**FOR THE DEFENDANTS, STEWART JONES AND MARY ROSE JONES:**

LAW OFFICES OF JOHN N. WHITE
1500 Main Street, Suite 922
Springfield, Massachusetts 01115-5369
(413) 788-0200
BY: DANIEL H. RIDER, JR., ESQUIRE

**FOR THE DEFENDANTS, BOLAND BUILDERS, INC. AND THOMAS BOLAND:**

ROBINSON DONOVAN, P.C.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115
(413) 785-4658
BY: NANCY FRANKEL PELLETIER, ESQUIRE

-AND-

LAW OFFICES OF MICHAEL F. JOSEPH
82 Maple Street
Springfield, MA 01105
(413) 737-3549
BY: MICHAEL F. JOSEPH, ESQUIRE

Also in Attendance:

Shawn, Liberty Mutual Insurance Company

---

Page 3

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THOMAS BOLAND | 5 | 57 | 67 | |

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Statement | 54 |

---

Page 4

S T I P U L A T I O N S

It is agreed by and between the parties that all objections, except as to the form of the question, are reserved to be raised at the time of trial for the first time.

It is further agreed by and between the parties that all motions to strike unresponsive answers are also reserved to be raised at the time of trial for the first time.

It is also agreed that the deponent will read and sign the deposition.

It is further agreed by and between the parties that notification to all parties of the receipt of the original deposition transcript is also hereby waived.

13

1 came up other times when I wasn't there. I wasn't
2 present at all times when he was there.
3    Q.   But between the time that he measured the
4 job and gave you the bid and then came on the site to
5 do the roofing, were you ever there when anybody from
6 Dade Roofing was there?
7    A.   No, I don't think so. I think they just
8 showed up one day. They kind of said, "We're coming
9 up," and they started. There was a section of the
10 garage that they could start working on anyway.
11   Q.   And when was that in relationship to the
12 date of the accident, if you can recall?
13   A.   I'd say maybe two weeks prior, a week
14 prior.
15   Q.   And the garage roof was done before the
16 main house roof?
17   A.   Yes. Because the main body wasn't even
18 ready yet.
19   Q.   During that period, between the time Dade
20 Roofing was doing the roofing on the garage and when
21 they started nailing the roofing on the house, was
22 there any occasion that Dade's people were anywhere
23 other than at the garage? Do you understand what I'm

14

1 asking?
2    A.   Yes. They were in the area. They walked
3 around the house. The garage was located at
4 lower -- down in the lower part of the driveway.
5 While they were down there working, there was several
6 of them. They'd be walking around, looking around.
7    Q.   Now, what was the state of the progress of
8 the main house roof during that period?
9    A.   The main house was existing roof. I had
10 nothing to do with it whatsoever. I was just putting
11 a small addition on the end of it.
12   Q.   Who put the tarpaper on the roof?
13   A.   I did.
14   Q.   And when did you do that in relationship to
15 the work on the garage?
16   A.   Oh. I think the garage was probably almost
17 done before I even got to there because I wasn't even
18 close to framing the addition when they were working
19 on the garage.
20   Q.   How long did it take to roof the garage?
21   A.   I couldn't tell you.
22   Q.   Was it just a couple of days or did it
23 stretch into weeks, if you know?

15

1    A.   It wasn't weeks, but it was probably two
2 days to a week, from what I remember.
3    Q.   Do you recall when in that process
4 you -- strike that.
5         Part of the remodeling and renovation
6 included cutting and installing skylights in the main
7 house, correct?
8    A.   Not in the main house, into the addition.
9    Q.   To the addition?
10   A.   Yes.
11   Q.   But the addition and the main house are all
12 connected, correct?
13   A.   Yes.
14   Q.   And the garage is a separate building?
15   A.   And the garage is a separate building,
16 correct.
17   Q.   I guess that's what I meant by main house.
18 I apologize.
19        We have some copies of colored photographs
20 from the Joneses' exhibit -- deposition and I'll show
21 you what's been marked as Mary Rose Jones Exhibit
22 No. 1, series of three photographs, and ask you if
23 you can identify first the top photograph.

16

1    A.   That's the house, existing house, the
2 addition.
3    Q.   And as -- so that's the --
4    A.   House of the Joneses.
5    Q.   And the garage is not in this picture?
6    A.   Exactly.
7    Q.   Now, the part that was being remodeled was
8 which portion?
9    A.   All the left-hand portion.
10   Q.   And the three skylights that are shown in
11 the left-hand portion, are those the three skylights
12 that were put in?
13   A.   Yes.
14   Q.   And the middle photograph appears to show
15 the same left-hand area from the perspective of sort
16 of the corner of the far left-hand side; is that
17 correct?
18   A.   Yes, that's correct.
19   Q.   So the three skylights would be the same
20 three skylights in the same three order -- same
21 order?
22   A.   That's correct.
23   Q.   When was the -- were the skylight holes cut

**9**

1  Mr. Dade to you?
2  A. That's correct. I don't recall 100 percent
3  but what she did was she contacted the roofing
4  contractor. And through the association through the
5  Joneses, I met them.
6  Q. And when did you first meet somebody from
7  Dade Roofing?
8  A. I don't remember the exact time, but it was
9  when I was working on the addition.
10 Q. And who was it that you met?
11 A. I do believe it was Bob Dade, Sr.
12 Q. So there are two Robert Dades?
13 A. Not 100 percent correct -- not 100 percent
14 sure, but I do believe so.
15 Q. There's a father and son Dade?
16 A. Yes.
17 Q. The individual who was injured is not the
18 father Dade; is that correct?
19 A. No. That was his son.
20 Q. And it was the father that you were
21 speaking with when you first formed the contract
22 or --
23 A. Yes.

**10**

1  Q. Was there a written contract with Dade
2  Roofing?
3  A. I don't remember, to be honest. I'd have
4  to look.
5  Q. Typically, do you have written contracts
6  with subcontractors?
7  A. Sometimes. Sometimes not.
8  Q. When you first spoke with senior Dade --
9  we'll distinguish between the two by Robert Dade, the
10 person who got hurt, and senior Dade, the person that
11 you contacted with -- contracted with Dade Roofing,
12 okay?
13 A. Okay.
14 Q. When you first spoke with senior Dade, what
15 was the nature of the discussion? What did you say
16 to him? What did he say to you?
17 A. I don't remember the discussion at the
18 time. The only thing it would have done with was
19 with the metal roof that needed to be done on the
20 house that was picked out by the Joneses.
21 Q. How did you bring on the price and the size
22 of the job and the specifics?
23 A. He came up to the job and they -- he

**11**

1  measured it, the existing part of the house and the
2  existing garage, and then gave a general idea what
3  was being done on the house that was being added on.
4  Q. And where was it in the construction
5  process that he came out to the house and measured
6  the job?
7  A. I couldn't -- honestly couldn't tell you.
8  Don't remember.
9  Q. The accident being September the 7th, 2001,
10 can you give me some time frame relative to that as
11 to when senior Dade came out and measured and bid the
12 job?
13 A. Maybe a month or two earlier.
14 Q. And do you recall who all was with him when
15 he came out?
16 A. With senior Dade?
17 Q. Right.
18 A. He just came out by himself to measure out
19 the job.
20 Q. Between that time and the time Dade Roofing
21 came on the job to start doing the roofing, did you
22 have any contact with anybody from Dade Roofing?
23 A. It's possible I talked to senior Dade.

**12**

1  Q. Okay.
2  A. I don't recall a hundred percent.
3  Q. What would typically be the kinds of things
4  that you would talk about between the time you bid
5  the job and --
6  A. It'd be a time frame or when they could
7  come up or whether the Joneses wanted to have the job
8  done period, they would have to agree on the
9  contract.
10 Q. And what the progress was with the job,
11 when the roof was going to be ready for them, things
12 like that?
13 A. Yes.
14 Q. Do you recall whether or not anybody from
15 Dade Roofing had been on the site prior to them
16 actually starting the roofing work?
17        MS. PELLETIER: Other than when senior
18 Dade came up the first time?
19        THE WITNESS: Other than -- yeah.
20 BY MR. CVEJANOVICH:
21 Q. Other than the day that he came up and
22 measured the job.
23 A. Not that I know of. Because I'm sure he

25

1  A.  The supply house.
2  Q.  So you had to go purchase it?
3  A.  Yes.
4  Q.  And about when did you return to the house?
5  A.  Late in the afternoon.
6  Q.  And what were -- what was going on at that
7 time?
8  A.  I had talked to the Joneses. They had
9 informed me that he had fallen through the skylight.
10  Q.  Looking at the outside of the house and the
11 roof, in the area where the tarpaper had been laid
12 down, were there any outside diagrams, markings to
13 show where the skylights were?
14  A.  There were markings on the paper, so
15 pencilwise --
16  Q.  What color was the tarpaper?
17  A.  Black.
18  Q.  What color was the pencil?
19  A.  Gray.
20  Q.  Like a regular No. 2 lead pencil; is that
21 what we're talking about?
22  A.  Yes.
23  Q.  And were there any barriers around any of

26

1 the skylight area holes?
2  A.  Not at the time.
3  Q.  Were there any construction tape or flags
4 or other indications that the skylights were in that
5 location?
6  A.  Not from up top, just from underneath.
7  Q.  So in terms of from up top, the only thing
8 was the gray pencil marking on the tarpaper?
9  A.  That's correct.
10  Q.  Does the gray -- what's the purpose of the
11 gray pencil?
12  A.  It's just to know where we cut out
13 the -- for the skylights.
14  Q.  How do you determine from the top side
15 where that is? Do you measure it from -- from some
16 landmark or do you punch holes in the tarpaper until
17 you get to the edge of the tarpaper?
18  A.  No. There's actually a little indentation
19 with your hand from a line that goes around it that
20 you can visually -- you can see.
21  Q.  So you get up there and you kind of feel
22 around where --
23  A.  Yeah. It's just set and then we cut around

27

1 where it is.
2  Q.  Now, is this the first roof that you have
3 put on a remodeling renovation -- by "roof," I mean
4 the subroof, the plywood -- or have you done that as
5 part of your business in the past?
6  A.  Yes.
7  Q.  You've done it in the past?
8  A.  I've done -- put plywood on before, yes.
9  Q.  And have you installed skylights in the
10 past?
11  A.  Yes.
12  Q.  And then papered them over?
13  A.  Papered them over and install the skylight
14 usually at the same time.
15  Q.  Okay. Have you ever had an occasion to cut
16 the skylight holes, put the paper up, and then have
17 the skylights installed at a different time, whether
18 it's the next day or several days or weeks later?
19  A.  No. I usually put the skylights -- as soon
20 as we start the roofing process, the skylights go in
21 at the same time. And the roofing process is part of
22 the paper.
23  Q.  And that would typically all be

28

1 accomplished in the same day?
2  A.  Yes.
3  Q.  And in the past, have you ever had occasion
4 to either delineate with markers or caution tape or
5 something like that or erect barriers around the
6 skylight locations in the roof?
7  A.  Generally it's done all at the same time so
8 it's a process of going forward, you lay the paper
9 down, you mark them out, and then you proceed. You
10 cut them out when you install the -- you install the
11 skylights.
12  Q.  So in the past, you have not had an
13 occasion to either put up barriers or markers; is
14 that correct?
15  A.  No.
16  Q.  Now, when you returned -- who in your crew,
17 if you can recall, did the tarpapering?
18  A.  I did the tarpaper.
19  Q.  And did you also do the gray pencil?
20  A.  Yes.
21  Q.  When you returned to the house after going
22 to purchase the rubber lining, had the accident
23 already occurred?

**Page 33**

the addition.

Q. Were you at the house when these pictures were taken?

A. Yes.

Q. Do you recall when that was?

A. No, I don't.

Q. Was it the same day as the accident?

A. No idea.

Q. Was it with -- okay. If it was within a day or two after, you don't have any recollection of that either?

A. Have no recollection whatsoever.

Q. Okay. Obviously, it was taken after the roof was fully installed?

A. These pictures over here were taken, yeah, after the roof was done. This over here doesn't look like there's any roof done.

Q. Where would the roof be in these pictures?

A. You can't really see it. The roof would be where the ladder is. That's the far rear of the house. That would be the rear -- facing from the front of the house, that would be the far left rear.

Q. The ladder that's shown erect, is that the

**Page 34**

location you saw a ladder when you came back from getting the rubber the day of the accident?

A. No.

Q. Where was the ladder that you saw?

A. The ladder was on the left-hand side.

Q. So that would've been on the side of the house that's shown on the left-hand side of these two photographs of Exhibit 3, but farther off the photograph?

A. That's correct.

Q. Now, after the accident, did you ever speak with Robert Dade, the person who got hurt, about how the accident happened?

A. No, I didn't.

Q. Did you speak to him at all after the accident for any reason?

A. No, I didn't.

Q. Did you speak to Dade, Sr. after the accident?

A. Yes, I did.

Q. And what did he tell you?

A. I just inquired how he was doing.

Q. Okay. Was there any -- other than the

**Page 35**

discussion of Robert Dade's health and what, if any, injuries he might have had, was there any discussion with Dade, Sr. about how the accident happened?

A. I really don't recall that.

Q. After the accident, did you give a statement to anybody about how the accident happened? And in particular I'm showing you a written statement.

A. Yes.

Q. Okay. The handwriting in the main body of the statement, that's not yours, is it?

A. No, it's not.

Q. The signature here -- and obviously, this is a copy -- but the signature is your signature?

A. Yes, it is.

Q. There are a couple of cross-outs in here. Let's see. Sort of the middle of the first page, there's one anyway. Is this your initial here?

A. I can't really tell if it is or not.

Q. Do you recall after the statement -- well, let me start over again.

How was the statement taken, if you can recall?

**Page 36**

A. Someone came out to the job and just questioned me about different things that have happened.

Q. And did that person write down what you were saying as you were relating it?

A. Yes.

Q. And afterwards, did you read the statement and then sign it?

A. Yes, I did.

Q. Okay. Actually, what I'd like you to do -- the handwriting is a bit difficult to read.

A. Yes, it is.

Q. But if you could -- just pick it up here, like two-thirds of the way down, on the sentence that "I had never worked with them before," okay? First of all, that part I read accurately, correct?

A. Yes.

Q. And by "I had never worked with them before," you meant Dade Builders -- Dade Roofing?

A. Yes.

Q. Go ahead and continue to read and then pause after each sentence or two because I want to ask you about what you were saying and what you

37

1  meant.
2  A.  "I believe they started in early September
3  2001."
4  Q.  Okay. So started the roofing early
5  September 2001?
6  A.  That's correct.
7  Q.  Okay. Go ahead.
8  A.  "They had a crew of five or six guys."
9  Q.  Okay.
10 A.  "They were going to put a metal roof on the
11 old part of the house plus the new..." --
12 Q.  Okay.
13     MS. PELLETIER:  I think it says
14 "construction."
15 A.  Is that what it is? "...construction I was
16 adding."
17     MS. PELLETIER:  Adding.
18 BY MR. CVEJANOVICH:
19 Q.  Okay. Just keep reading unless I sort of
20 interrupt.
21 A.  "On the 7th, they were finishing up the
22 garage roof, which was separate from my job. I was
23 working on the new addition and had put in three

38

1  skylights on the front side. We had a..."
2     MS. PELLETIER:  Discussion.
3  A.  Oh, discussion. "...discussion on the
4  flashing for the skylights. And I had to get a
5  different" or a -- "get a different type which was
6  compatible with the metal roof."
7  Q.  Okay. That's the flashing that you had to
8  get?
9  A.  Yes. That's correct.
10 Q.  I thought you had to get rubber. Was it
11 flashing rubber?
12 A.  The rubber is flashing.
13 Q.  Okay. Go ahead.
14 A.  It's just a different type.
15     "I had to leave for materials at 12:30 to
16 1 o'clock. I was talking to the crew chief, Bob
17 Dade, the..." --
18     MS. PELLETIER:  Son.
19 A.  "...the son of the owner. We were in the
20 driveway."
21 Q.  Go ahead.
22 A.  "They were up around to the side of the
23 house. Our ladder was left on the ground. They had

39

1  put it up and front back" --
2  Q.  "Against the back."
3  A.  Oh. "...against the backside of the house.
4  I saw two men, Bob Dade and Mike, on the old house
5  next to the dormer. They said they were looking
6  around the dormer on the old house..."
7  Q.  Okay. Where is the dormer in the
8  photographs?
9  A.  This would be the dormer here.
10 Q.  Okay. So that's that area that's over the
11 entranceway?
12 A.  Yeah.
13 Q.  Okay. Here we go.
14 A.  "...to see what they would have to do."
15 Q.  It look his like it says, "I asked."
16 A.  "I asked if there was a problem. They did
17 not" something "on new" --
18 Q.  Oh. "They did not go"?
19 A.  "They did not go on the new part I was
20 working on. I had" something --
21 Q.  "Carved out"?
22 A.  "...carved out the skylight with 30
23 pound..."

40

1  Q.  Oh. "Covered?"
2  A.  Covered. Yeah. "...covered the roof of
3  the skylight" or something "with 30 pound felt
4  previously a week before or..."
5  Q.  So.
6  A.  "...or so."
7  Q.  All right. Let me stop you there. You
8  wouldn't cover the roof until after the skylight
9  holes were cut in, correct?
10 A.  The skylight -- the roof wouldn't get
11 covered until after it's cut in from the plywood.
12 Q.  Let me reask it. The process would be, you
13 put the plywood down and then cut the holes and then
14 put the tarp on, correct?
15 A.  That is correct.
16 Q.  I'm sorry. I called it tarp. Tarpaper?
17 A.  The paper, yeah.
18 Q.  The statement, correct me if I'm wrong,
19 says that the tarpaper had gone up about a week
20 before the events that you were talking about that
21 day, with the ladder and asking Dade if there was a
22 problem and stuff like that; is that correct?
23 A.  Yeah. It says a week or so.

**45**

1  not speak with anybody from Dade Roofing about how
2  the accident actually happened. Did you talk with
3  anybody from Dade about how the accident happened?
4      MS. PELLETIER: Objection.
5      Go ahead.
6  A.  I talked to his -- I must have talked to
7  Mike. I don't recall.
8  BY MR. CVEJANOVICH:
9  Q.  Okay. As we sit here today, do you recall
10 actually talking to Mike, not necessarily the
11 substance of what was said?
12 A.  Yes. I do believe so. But I'm not 100
13 percent sure. I can't say yes.
14 Q.  And as we sit here today, do you recall
15 what the substance of that conversation would've
16 been?
17 A.  No, I don't.
18 Q.  The next sentence says, "The roof has such
19 a steep pitch that you have to run up it." And then
20 it says, "I have read the above two pages and they
21 are true and correct," et cetera. So the last
22 sentence having to do with the events is "the roof
23 has such a steep pitch that you have to run up it,

**46**

1  correct?
2  A.  That's correct.
3  Q.  Do you know what the pitch is in terms of
4  degrees, 30 degrees, 45 degrees?
5  A.  I couldn't tell you.
6  Q.  How did you conclude that the pitch was so
7  steep that you had to run up it?
8  A.  Because I couldn't walk up it.
9  Q.  That was your own experience?
10 A.  That's my own experience.
11 Q.  Up and down?
12 A.  Up and down it.
13 Q.  If you were going to do something on this
14 left front portion of the house, you would put the
15 ladder up somewhere in that area; is that correct?
16 A.  When I was working?
17 Q.  Right.
18 A.  It would be on the rear side of the house.
19 Q.  Why would you do it on the rear side of the
20 house instead of the front side of the house, if you
21 were going to be working on the front side of the
22 house?
23 A.  Because it's extremely steep in the front.

**47**

1  You need a very large ladder to get up there.
2  Q.  Is the pitch shallower or less steep in the
3  back?
4  A.  No, it's not. On the lower section, yes.
5  The upper section, no.
6      MS. PELLETIER: Are we talking about
7  the roof or the ground?
8      MR. CVEJANOVICH: I'm talking about
9  the roof.
10 BY MR. CVEJANOVICH:
11 Q.  So the pitch on the backside of the roof is
12 the same as the front side of the roof; is that
13 correct?
14 A.  That's correct.
15 Q.  So why would you need to put the ladder on
16 the backside of the roof, as opposed to the front
17 side of the roof, if the pitch is the same? I mean,
18 I'm not following you.
19 A.  Because when a ladder goes on the rear side
20 of the house, it's only seven to eight feet to the
21 ground. On the front of the house, it's like 30
22 feet.
23 Q.  Oh, okay. Okay. So the elevation is much

**48**

1  greater on the front side of the house than the
2  backside of the house?
3  A.  Yes.
4  Q.  Okay. Okay. And once you got off the
5  ladder, what would you do next, if you were going
6  though the front side of the house? Would you have
7  to run up the backside of the roof?
8  A.  No. You could get up -- there's a valley
9  or something on the roof on the backside of the
10 house.
11 Q.  Okay. Where would it be that you would
12 have to run up the roof that you were referring to in
13 the statement, on page 2 of the statement?
14 A.  Anywhere of the steep part.
15 Q.  And you're pointing to the front part of
16 it --
17 A.  The front part of the house.
18 Q.  Okay. And why is it that you would have to
19 run up the roof on the front part of the house but
20 not the back part of the house?
21     MS. PELLETIER: Objection.
22     Go ahead.
23 A.  Because there is a valley or something you

49

1 can hang onto on the dormer on the rear side of the
2 house, a little cubby hole, basically, you can climb
3 up on.
4   Q.  The dormer is sort of in the middle of the
5 house, correct?
6   A.  That's correct.
7   Q.  So you put the ladder in a position in
8 towards the middle of the house so you could access
9 the dormer; is that what you're saying?
10   A.  All depends on where you put the location
11 of the ladder.
12   Q.  Suppose you put the ladder directly behind
13 the skylights --
14   A.  On the rear of the house?
15   Q.  -- 180 degrees, would you then have to run
16 up the pitch of the roof in order to get to the top
17 of the roof?
18   A.  No.
19   Q.  Why is that?
20   A.  Because there's a dormer on the rear side
21 of the house which you could walk up to or hang on
22 to, which there isn't on the front.
23   Q.  Is that the backside of this same dormer

50

1 that's shown --
2   A.  That's correct.
3   Q.  -- in the middle picture?
4       So you'd position the ladder in such a way
5 that you'd have -- be able to get a hand hold on the
6 backside of that dormer?
7   A.  That's correct.
8   Q.  Now, if, for whatever reason, you put the
9 ladder on the backside of the roof, in the area
10 within, say, the first four or five feet of the
11 right-hand edge of the house, would you then have to
12 run up the roof to get to the peak of the roof?
13       MS. PELLETIER:  Objection.
14   A.  There is a lower sloped roof, which is on
15 the bottom.
16   Q.  Once you got --
17   A.  Once you got past that, you didn't have to
18 run.
19   Q.  Okay.  Okay.  Before the day of the
20 accident, do you know whether or not Bob Dade, first
21 of all, himself, had ever been up on top of the roof?
22   A.  I don't recall.
23   Q.  Before the date of the accident, do you

51

1 know whether anybody from Dade Roofing had been on
2 top of the roof?
3   A.  Before the accident?
4   Q.  Right.  Let me rephrase it.
5       Before you left to go get the flashing --
6 because, you know, after that, you weren't there --
7 but at any time before that, did you ever see anybody
8 from Dade Roofing up on the roof?
9   A.  They were -- they were up on the roof at
10 some point on the existing part of the house, but I
11 do not recall when.
12   Q.  Do you recall what it was that they were
13 doing?
14   A.  They were up there -- I had seen them up
15 there.  They had said something about measuring up
16 something on the corner part of the house.  I had
17 asked them what they were doing.
18   Q.  And which area, if you can point to, as
19 close as you can get, on any of the photographs.  And
20 if you can't pinpoint it --
21   A.  It would be the far right side of the
22 center dormer that you're referring to.  Because that
23 is the existing part and I was working to the far

52

1 left.
2   Q.  But on the front side of the house or
3 the --
4   A.  On the front side.
5   Q.  So the area is actually shown in the top
6 exhibit?
7   A.  That's correct.
8   Q.  And you thought -- your recollection is
9 that they were measuring something but you can't
10 recall what it was?
11   A.  Just from the statement, that's what I
12 recall.
13   Q.  After the accident, when was the roof,
14 metal roof, completed?
15   A.  I don't remember.
16   Q.  Do you recall whether it was done the next
17 day or if it took a week or two?
18   A.  No.  It was -- it would have to be after I
19 finished doing the addition part.  And then after
20 that, they pretty much went in and finished up the
21 roof.  I don't remember a time frame.
22   Q.  So the metal roof was not completed -- was
23 not put on until the rest of the addition over here

57

1 questions I have. Thank you.
2         CROSS-EXAMINATION
3 BY MR. RIDER:
4    Q.   Mr. Boland, my name is Daniel Rider and I
5 represent Stewart and Mary Jones in this suit. I
6 just have a couple of issues I want to clear up, if I
7 can. The construction that you were doing, was there
8 a permit needed for that?
9    A.   **Yes, there was.**
10   Q.   And did you pull the permit for the
11 construction?
12   A.   **I don't remember.**
13   Q.   From whom would you have to get a permit
14 for this type of work?
15   A.   **Through the building department.**
16   Q.   Of the town of Huntington?
17   A.   **Yes, that's correct.**
18   Q.   The permit that you would have to pull for
19 work of this type, what would Huntington require from
20 you?
21   A.   **If I pulled the permit at the time, pretty**
22 **much just a license from the state.**
23   Q.   You had to describe --

58

1    A.   **And a drawing -- and a drawing of what**
2 **was -- the work being done and a description.**
3    Q.   That was my next question. What kind of
4 drawing, construction plan or something on a napkin
5 or --
6    A.   **They're pretty vague, actually.**
7    Q.   Just a general --
8    A.   **Just a general idea of what's going on.**
9    Q.   If I'm not mistaken, I believe you say in
10 this statement that you obtained a permit. In any
11 case, as you sit here today, you don't recall --
12   A.   **I don't recall. Sometimes the homeowners**
13 **pull them out.**
14   Q.   As you sit here today, do you have any
15 knowledge of the Joneses pulling a permit --
16   A.   **I don't remember.**
17   Q.   What happens to a permit when the
18 construction is done?
19   A.   **I have no idea.**
20   Q.   Is that something you see nailed inside
21 the --
22   A.   **Every town is different.**
23   Q.   Were the skylights always a part of the

59

1 plan, as far as you were concerned?
2    A.   **I don't remember that.**
3    Q.   From day one to finishing, how long was
4 your construction?
5    A.   **I don't remember the exact time.**
6    Q.   A week or a month?
7    A.   **A couple months, a month.**
8    Q.   So you don't know when -- as you sit here
9 today, you don't know when you realized there was
10 going to be skylights involved?
11   A.   **I don't recall. It's been a while.**
12   Q.   Let me ask you: Do you know when Dade knew
13 there was skylights involved?
14   A.   **I don't recall.**
15   Q.   You don't know if he was told when you
16 offered the job to him?
17   A.   **Oh. I'm sorry. I'm getting mixed up**
18 **between the Joneses and the Dades. Yes. At the time**
19 **when they came, it was in the framing process, so the**
20 **skylights were -- yes.**
21   Q.   So Dade knew from day one that there were
22 going to be skylights in the roof he was putting on?
23   A.   **Yes.**

60

1    Q.   Now, before the fall -- strike that.
2        I think when you were answering questions
3 as to marking out the skylight with the gray pencil
4 on the paper?
5    A.   **Yes.**
6    Q.   And you said you marked out the --
7    A.   **Yes, I did.**
8    Q.   -- the skylight?
9        So you were obviously on the roof after the
10 paper was on?
11   A.   **Yes.**
12   Q.   And before the plaintiff fell through the
13 roof?
14   A.   **Yes.**
15   Q.   And I think you mentioned you could tell
16 where to pencil out the skylight because you could
17 see an indentation?
18   A.   **Yes. And there's an indentation in**
19 **the -- what I do is just make a mark with a pencil**
20 **and make a mark with my hands, so -- it's hard to**
21 **describe.**
22   Q.   I think I know what you mean. The paper
23 would droop into the hole?

PLAINTIFF'S EXHIBIT
T. Boland - 1
10-21-05

Case 3:04-cv-30172-KPN    Document 26-3    Filed 03/06/2006    Page 10 of 12

EXHIBIT
2A

October 26, 2001
9:30 AM

This is the statement of Tom Boland, 38, of 27 Leonard Street, Agawam, Mass. I am owner of Boland Builders for the past 13 years. I have no employees. I have been in construction work all my life and specialize in additions and remodeling. I was contracted by Stuart and Mary Rose Funder of 169 Worthington Road in Huntington, Mass to put an addition on their house. I drew up the plans and started in August 2001. I gave them a bid of $97,000 and it was accepted but no signed contract. I have to sub out many of the trades. I usually do the roofing but the customer wanted a metal roof so I contacted Seamless Metal Roofing from Farmington, Ct. A contract was written up by them and I signed it and gave them a deposit. They gave me a certificate of insurance. The customer was the one that this company and wanted them to do it. I had never worked with them before. I believe they started in early September 2001. They had a crew of 5 or 6 guys. They were going to put a metal roof on the old part of the house plus the new construction I was adding. On the 7th they were finishing up the garage roof which was separate from my job. I was working on the new addition and had put in 3 skylights on the front side. We had a discussion on the flashing for the skylights and I had to get a type which was compatible with the metal roof. I had to leave for materials at 12:30 to 1 PM. I was talking to

-2-

the crew chief, Bob Dade to the son of the owner. We were in the driveway. They came up around to the side of the house. My ladder was left on the ground. They put it up against the back side of the house. I saw 2 men, Bob Dade and Mike in the old house next to the dormer. They said they were looking around the dormer in the old house to see what they would have to do. I asked if there was a problem. They did not go on the new part I was working on. I had covered up the sky lights with 30 pound felt previously a week before too. Bob and Mike had been inside the new addition and looked up to see the openings for the skylights. I painted them out with owner Mr. Jones. I stopped there later in the day and my wife had call that Bob  
had fallen through a skylight. I rushed back but the crew was gone. There was a hole in the felt paper. The homeowners were home at the time. When I spoke to Mike the next week he said Bob forgot about the skylights. The roof has such a steep pitch that you have to run up it. I have read the above 2 pages and they are true and correct to the best of my knowledge.

Jeffrey Hayes                    X _____

This is the statement of Tom Boland, 38, of 27 Leonard Street, Agawam, Mass. I am owner of Boland Builders for the past 13 years. I have no employees. I have been in construction work all my life and specialize in additions and remodeling. I was contracted by Stuart and Mary Rose Jones of 169 Worthington Road in Huntington, Mass to put an addition on their house. I drew up the plans and started in August 2001. I gave them a bid of $97,000 and it was accepted but no signed contract. I have to sub out many of the trades. I usually do the roofing but the customer wanted a metal roof so I contacted Seamless Metal Roofing from Torrington CT. A contract was written up by them and I signed it and gave them a deposit. They gave me a Certificate of Insurance. The customer was the one that (?) this company and wanted them to do it. I had never worked with them before. I believe they started in early September 2001. They had a crew of 5 or 6 guys. They were going to put a metal roof on the old part of the house plus the new construction I was adding. On the 7th they were finishing up the garage roof which was separate from my job. I was working on the new addition and had put in 3 skylights on the front side. We had a discussion on the flashing for the skylights and I had to get a ____ which was compatible with the metal roof. I had to leave for materials at 12:20 to 1:00 p.m. I was talking to the crew chief Bob Dade the son of the owner. We were in the driveway. They came up around to the side of the house. My ladder was left in the ground. They put it up against the back side of the house. I saw 2 men, Bob Dade and Mike in the old house next to the dormer. They said they were looking around the dormer in the old house to see what they would have to do. I asked if there was a problem. They did not ____ on the new part I was working on. I had covered roof the skylights with 30 pound felt previously, a week before or so. Bob and Mike had been inside the new addition and looked up see the openings for the skylights. I pointed them out with owner Mr. Jones. I stopped home later in the day and my wife had call that Bob Dade had fallen through a skylight. I rushed back but the crew was gone. There was a hole in the felt paper. The homeowners were home at the time. When I spoke to Mike the next week he said Bob forgot about the skylights. The roof has such a steep pitch that you have to run up it. I have read the above 2 pages and they were true and correct to the best of my knowledge.

Jeffrey Hayes                                              X Tom Boland