## Page 1

UNITED DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Hampden, ss

Civil Action No. 04 30172 KPN

ROBERT DADE,
        Plaintiff

v.

BOLAND BUILDERS, INC.,
THOMAS BOLAND, STUART HONES
and MARY ROSE JONES,
        Defendants

DEPOSITION OF: ROBERT DADE, taken before MYREL J. WILLIAMS, Notary Public and Court Reporter, pursuant to the applicable Massachusetts Rules of Civil Procedure, at the LAW OFFICES OF ROBINSON DONOVAN, P.C., 1500 Main Street, Springfield, Massachusetts, on January 20, 2006.

Myrel J. Williams
Certified Shorthand Reporter -1393S95

## Page 2

APPEARANCES:

FOR THE DEFENDANT:
O'CONNELL, FLAHERTY & ATTMORE
1350 Main Street
Springfield, MA 01103
(413) 747-1773
    BY: JOHN A. CVEJANOVICH, ESQ.

FOR THE PLAINTIFF:
ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, MA 01115
(413) 732-2301
    BY: NANCY F. PELLETIER, ESQ.

FOR THE PLAINTIFF:
LAW OFFICES OF JOHN N. WHITE
1500 Main Street, Suite 900
Springfield, MA 01105
(413) 788-0200
    BY: DANIEL H. RIDER, ESQ.

ALSO PRESENT: Shawn Breault, Liberty Mutual

## Page 3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Robert Dade | *4 | **72 | | |

\* By Ms. Pelletier
\*\* By Mr. Rider
\*\*\*By Mr. Cvejanovich

EXHIBITS:                           PAGE:

Exhibit 1, document.................. 80
Exhibit 2, photographs............... 93

## Page 4

STIPULATIONS

It is agreed by and between the parties that all objections, except objections as to the form of the questions, and all motions to strike unresponsive answers are reserved and may be raised at the time of trial for the first time.

It is further agreed by and between parties that the sealing, and the notification to all parties of the receipt of the original deposition transcript is hereby waived.

      ROBERT DADE, Deponent, having first been duly sworn and identified, deposes and states as follows:

      MS. PELLETIER: Before we begin the deposition, for the record, we were advised by plaintiff's counsel that he has no form of identification whatsoever on him. He left his driver's license at home and his wallet is not on him either. Plaintiff's counsel has just met him for the first time today so cannot attest to the fact he is, in fact, the

**Page 13**

1  Q.  What were you being paid when you
2  first started working there?
3  A.  $16 an hour.
4  Q.  Did you have any benefits?
5  A.  Yes, they have the 401K plan, paid
6  holidays, four weeks vacation, three personal
7  sick days, health insurance.
8  Q.  Had you ever worked as a laborer for
9  a window company before you began with J.C.
10 Tonnotte?
11 A.  No.
12 Q.  For what period of time did you work
13 as a laborer?
14 A.  Excuse me?
15 Q.  For what period of time did you work
16 as a laborer?
17 A.  One year.
18 Q.  And then what was your job?
19 A.  The same job except for I handle all
20 the -- I run all the trim coils. We've got two
21 crews of two and I handle that.
22 Q.  What does that mean by handle that?
23 A.  Basically like a foreman.
24 Q.  Since you've began working for J.C.

**Page 14**

1  Tonnotte has there been any period of time that
2  you've missed work for anything except for a
3  common cold or illness such as that?
4  A.  No.
5  Q.  Do you claim that any injury or
6  ailment that you suffered as a result of the
7  incident in September of 2001 affects your
8  ability to perform your job at J.C. Tonnotte?
9  A.  Yes, sometimes. I do a lot of
10 ladder work.
11 Q.  How does it affect your ability to
12 perform your work?
13 A.  My foot gets sore.
14 Q.  How does it affect your ability to
15 perform your work?
16 A.  Going up and down the ladder, yes,
17 it slows me down.
18 Q.  Has there been any occasion on which
19 you were unable to complete a task at work as a
20 result of the injuries you claim you sustained in
21 September of 2001?
22 A.  No.
23 Q.  Have you been reprimanded or warned
24 or given any kind of warning from anybody at J.C.

**Page 15**

1  Tonnotte regarding the performance of your work
2  which was in any way related to the injury you
3  claimed you received in September of 2001?
4  A.  No.
5  Q.  Have you been reprimanded or warned
6  for other reasons?
7  A.  No.
8  Q.  What are you making now?
9  A.  19.
10 Q.  Did it go from 16 to 19 directly or
11 was there some interim stuff?
12 A.  It was two or three months into work
13 and I got a $2 wage increase and then my year
14 review I got another dollar.
15 MS. PELLETIER: Off the record.
16 (Off record discussion)
17 MS. PELLETIER: Back on the record,
18 please. For the record, we have yet to
19 receive any documentation of the loss of
20 earning capacity claim. Counsel has agreed
21 to obtain tax returns, both state and
22 federal, that were requested in discovery by
23 both parties in this case and provide them to
24 us.

**Page 16**

1  MR. CVEJANOVICH: Yes.
2  Q.  (By Ms. Pelletier) Prior to working
3  at J.C. Tonnotte, where did you work?
4  A.  I was self-employed. I
5  subcontracted for Seamless Metal Roofing Company.
6  Q.  You were self-employed and you
7  subcontracted from Seamless Metal --
8  A.  Roofing Company.
9  Q.  -- Roofing Company. And what were
10 you doing as your job?
11 A.  Installing metal roofs.
12 Q.  How long were you self-employed in
13 that capacity?
14 A.  I believe it was two years all
15 together. It was one year and then the year
16 before that I subcontracted doing siding with
17 Peter O'Brown. Before that was Seamless Metal
18 and the year before that was Peter O'Brown again.
19 Q.  When did you first start doing work
20 installing metal roofs?
21 A.  I believe I was 22.
22 Q.  Do you know what year that would
23 have been?
24 A.  I'm 38 now, so that's 16 years ago,

**Page 17**

1990.
Q. What, if any, training did you receive?
A. I was just trained by my father and his employer Doug Couch.
Q. So was your father also an installer at Seamless Metal Roofs?
A. Yes.
Q. Since that time have you ever received any additional training from anybody?
A. No.
Q. What was the training that you received from your father and his employer?
A. They showed me how to applicate it.
Q. Did you ever have any safety training?
A. No, I was always taught to be safe though. I always set a ladder upright. I don't use staging that's faulty. I don't use the skill saw if the guard doesn't work, nail gun if the safety doesn't work. I don't use that. I was taught always to be safe actually.
Q. Did you work for your father's employer for some period of time?

**Page 18**

A. Yes, I actually worked for -- for Doug Couch.
Q. Spell the last name?
A. C-O-U-C-H.
Q. Did he have a company or just Doug Couch?
A. Yeah, first he had a siding company, which was Seamless Siding and Gutters and then he went into the roofing business, which is called Seamless Metals.
Q. When you first started working for him, were you working for Seamless Metal or Seamless Siding?
A. Seamless Siding.
Q. Were you actually employed by him?
A. Yes, I was working by the hour at that time.
Q. At some point you stopped working for him as an employee and began working for him as an independent contractor?
A. Yes, I was 17 years old. Actually, I was 17 years old I first started subcontracting. Then when I was 22, I started working by the hour. I worked by the hour for

**Page 19**

three or four years and then I went back to subcontracting.
Q. Did you have any written agreement with Mr. Couch?
A. Written agreement as to what?
Q. Did you with him?
A. Can you give me more information? I don't understand the question.
Q. When you were a subcontractor, did you have any written arrangement with Mr. Couch as to how you would get paid, the hours you would work, what jobs you would work?
A. No.
Q. Nothing?
A. No, no, nothing written.
Q. When you first started working as a subcontractor for Mr. Couch, how were you paid?
A. I was paid by the square, that's a 10 by 10 area.
Q. Did he continue to operate Seamless Metal Roofing with his own employees when you were working as an independent contractor?
A. Yes.
Q. Did you ever go out and bid any jobs

**Page 20**

for Mr. Couch?
A. No.
Q. The job that we're here to talk about, is that a job that was arranged by Seamless Metal Roofing or you or who?
A. Seamless Metal Roofing.
Q. Did you ever advise anybody at Boland Builders that you were not employed by Seamless Metal Roofing?
A. No.
Q. Did you bid the job?
A. No.
Q. Who did?
A. My father, Robert Dade.
Q. So was your father acting for Seamless Metal Roofing or you?
A. Yes.
Q. So your father, Robert Dade, went out and bid the job for Seamless Metal Roofing?
A. Correct.
Q. Then you showed up to do the job as an independent contractor?
A. I'm a subcontractor.
Q. But you never told anybody that you

```
 1  were a subcontractor, is that correct?
 2       A.    Yes.
 3       Q.    Did your father ever tell anybody
 4  that Seamless Metal Roofing wasn't the entity
 5  that was going to be performing the work?
 6       A.    Not to my knowledge.  I wasn't
 7  there.
 8       Q.    Did you have a corporation or
 9  partnership or any kind of an entity that you
10  worked under as an independent -- as a
11  subcontractor?
12       A.    What do you mean partner?
13       Q.    How did you get paid by Seamless
14  Metal Roofing for the job that's the subject
15  matter of this case?
16       A.    Excuse me, say it again?
17       Q.    How did you get paid by Seamless
18  Metal Roofing for the job that forms the subject
19  matter of this case?
20       A.    The job I got hurt on?
21       Q.    Yeah.
22       A.    I didn't get paid for that job.  I
23  fell through the roof and got hurt.  You don't
24  work, you don't get paid.
                                              21
```

```
 1       Q.    When you were hired by Seamless
 2  Metal Roofing to perform that job, was there
 3  anything in writing between you and Seamless
 4  Metal Roofing?
 5       A.    No.
 6       Q.    What was the arrangement between
 7  Seamless Metal Roofing and you in connection with
 8  this job?
 9       A.    I do the job.  I get paid when it's
10  half done -- I get paid half when it's half done
11  and when it's finished, I get paid the other
12  half.
13       Q.    You personally?
14       A.    Yes, by check.
15       Q.    The check is written to Robert Dade?
16       A.    Yes.
17       Q.    Not any kind of corporation or
18  anything like that?
19       A.    Not at all.  I didn't get any check
20  from that job because, you know, I didn't do the
21  job.  I worked one day on it.  Actually, a day
22  and a half.
23       Q.    How much were you supposed to be
24  paid according to you?
                                              22
```

```
 1       A.    It was $150 per square.
 2       Q.    That's to you personally?
 3       A.    Yes.
 4       Q.    Did that include -- strike that.
 5             How many buildings were you putting
 6  roofs on at the subject location?
 7       A.    There were two buildings.  There was
 8  some kind of garage-type building and then the
 9  main building, which had an addition.
10       Q.    Was the 150 per square for both
11  buildings?
12       A.    Yes.
13       Q.    Did you perform any work on the
14  garage building?
15       A.    Yes.
16       Q.    Did you get paid for that?
17       A.    Yes.
18       Q.    How much?
19       A.    150 per square.
20       Q.    How much?
21       A.    Whatever the squares were.
22       Q.    You don't remember?
23       A.    No, I don't remember.  I believe the
24  garage was probably about two and a half or three
                                              23
```

```
 1  square.  I've done so many roofs it's kind of
 2  hard to remember the exact size of them all.
 3       Q.    Did you have any employees at any
 4  time?
 5       A.    Yes.
 6       Q.    As of the date of this incident,
 7  who are you employees?
 8       A.    Mike Valentino.  I don't know if I
 9  am pronouncing that right.
10             MR. RIDER:  With a V?
11             THE WITNESS:  Yeah, V.  And then I
12     believe it was Keith Bryant, and there might
13     have been one other guy.  I don't recall.
14       Q.    (By Ms. Pellieter)  If these were
15  employees, is it safe to assume you provided them
16  with W2s?
17       A.    I paid them under the table.
18       Q.    Have you ever advised the Sate of
19  Connecticut since that time that you were doing
20  that?
21       A.    No.
22       Q.    How much did you pay Mike Valentino?
23       A.    I think it was $12 an hour.  I'm not
24  exactly sure.
                                              24
```

```
 1    Q.   How about Keith Bryant?
 2    A.   I think it was about the same.
 3    Q.   How long had Mike Valentino worked
 4  for you?
 5    A.   I believe about six months.
 6    Q.   What, if any, experience did he have
 7  in installing seamless metal roofs before that?
 8    A.   He was working for the company, I
 9  think, for two years before that.
10    Q.   The company meaning Seamless Metal
11  Roofing?
12    A.   Yes.
13    Q.   What about Keith Bryant?
14    A.   Keith Bryant actually had more
15  experience than that. I believe it was about six
16  or seven. I'm not exactly sure.
17    Q.   Six or seven what?
18    A.   Years.
19    Q.   Did he also work for Seamless Metal
20  Roofing?
21    A.   Yes, he also worked for Seamless
22  Siding too, as well. The company switched. He
23  went from one thing to the other.
24    Q.   Did you ever get a 1099 from
                                                  25
```

```
 1  Seamless Metal Roofing?
 2    A.   Yes.
 3    Q.   Who is Michael Moffit?
 4    A.   Who is he?
 5    Q.   Um-hum.
 6    A.   He was our employee at Seamless
 7  Metals.
 8    Q.   Employee?
 9    A.   Employee. Well, he would
10  subcontract as well. On the bigger jobs we went
11  together and then we did separate ones.
12    Q.   I'm a little confused as to how this
13  arrangement works. How would somebody decide
14  whether Seamless would be at the site or you or
15  Seamless or somebody who used to work at
16  Seamless, how would that work?
17    A.   How do you mean?
18    Q.   This job, let's talk about this job.
19    A.   This job, okay.
20    Q.   You made an allegation that you
21  were, as of today, the subcontractor of Seamless
22  Metal Roofing hired to do the work at this site,
23  is that right?
24    A.   Right.
                                                  26
```

```
 1    Q.   And that your father was working for
 2  Seamless Metal Roofing at the time and he went
 3  out and he priced the job?
 4    A.   Sure, he's a salesman at Seamless
 5  Metal Roofing.
 6    Q.   At some point you go out to this
 7  site to perform some work, correct?
 8    A.   Yes.
 9    Q.   Because at some point you get hired
10  by Seamless Metal roofing to do something,
11  correct?
12    A.   Yes.
13    Q.   What did you get hired to do?
14    A.   To do the roof.
15    Q.   What does that mean?
16    A.   That means I go to the job and then
17  we bring a machine and we measure how long the
18  roof panels are.
19    Q.   We who?
20    A.   Me and a couple of the guys who were
21  working for me, Mike and Keith and someone else
22  and Michael Moffit too.
23    Q.   Well, Michael Moffit wasn't working
24  for you? That is where I'm getting confused
                                                  27
```

```
 1  here.
 2    A.   He's a subcontractor as well. We
 3  both subcontract all the time. On bigger jobs we
 4  would get together and do it together.
 5    Q.   What were the arrangements between
 6  you and Michael Moffit as to who was going to do
 7  what on this job?
 8    A.   We all worked together.
 9    Q.   So you --
10    A.   As a team.
11    Q.   So you and Mr. Moffit both
12  subcontracted with no written agreement to work
13  as a team on this job?
14    A.   Yes.
15    Q.   How much did he get paid?
16    A.   Half.
17    Q.   Half of what?
18    A.   We split it down the middle.
19    Q.   So if it was 150 square?
20    A.   Say it was $5,000 --
21    Q.   Is 150 squares just for you or is
22  150 squares divided by two because Mr. Moffit got
23  half?
24    A.   75 and 75, Mr. Moffit got half.
                                                  28
```

```
1    Q.   So you did not get 150 as testified?
2    A.   You asked how much I get paid.
3    Q.   Then you said 150 square.  You did
4  not, you got half of that, correct?
5    A.   Yes, on that particular job, yes.
6    Q.   Did Mr. Moffit have any employees?
7    A.   Yes, we used the same guys and
8  rotated them around.
9    Q.   On this job who paid Mr. Valentino
10 and from Mr. Bryant?
11   A.   We both paid them.  We took it off
12 the top.  Actually, I only did the garage, so he
13 paid them himself for the main building.
14   Q.   How many times did you work under
15 the arrangement that you just described with
16 Seamless Roofing and Seamless Metal Roofing and
17 Mike Moffit?
18   A.   I don't recall exactly, but probably
19 about 20 or more jobs.
20   Q.   You've made allegations in this case
21 that you had to forego -- you personally, 12 jobs
22 as a result of the injury that you suffered in
23 this case, are you aware of that?
24   A.   Yes.
```
29

```
1    Q.   One of the jobs is identified as
2  D-U-B-R-A-Y, are you familiar with that?
3    A.   No, I don't recall.
4    Q.   Do you recall a single job that you
5  claim that you were required to forego?
6    A.   Do I, no.
7    Q.   Do you have any documentation to
8  show that you had been hired by Seamless Metal
9  Roofing to perform any job that you claim you
10 were required to forego?
11   A.   No, there is nothing written like I
12 told you before.
13   Q.   So there's no documentation to claim
14 you were to forego any job that you were required
15 to forego a single job, as a result of the
16 injuries you claim you sustained in September of
17 2001, is that correct?
18   A.   Yes.
19   Q.   In fact, you indicated that Mr.
20 Moffit ended up doing the jobs that you were
21 required to forego?
22   A.   Yes.
23   Q.   Mr. Moffit was all ready working as
24 a subcontractor prior to this incident for
```
30

```
1  Seamless Roofing, correct?
2    A.   Yes.
3    Q.   Do you have any documents whatsoever
4  that support your claim that you have any loss of
5  earning capacity as a result of the injuries you
6  sustained in September of 2001?
7    A.   No.
8    Q.   Who is Michael --
9         MR. CVEJANOVICH:  Note an objection.
10   That's in part a legal question.
11   Q.   (By Ms. Pelletier)  Michael V-O-L-I?
12   A.   Who is he?
13   Q.   Yes.
14   A.   He's one of the employees.
15   Q.   One of whose employees?
16   A.   He worked for me and Mike Moffit.
17   Q.   You've identified Mr. Voli as a
18 person who has knowledge of the incident as
19 alleged in your complaint and also indicated that
20 he's expected to testify as to the condition of
21 the roof and to what he witnessed, do you
22 understand that?
23   A.   Yes.
24   Q.   You also identified Mr. Moffit as
```
31

```
1  being your partner at the time of this incident,
2  are you aware of that?
3    A.   Yes.
4    Q.   Was Mr. Moffit your partner?
5    A.   Yes, sometimes we'd be partners and
6  sometimes we wouldn't.
7    Q.   On this job was he your partner?
8    A.   Yes, we were partners.
9    Q.   How did you decide whether you were
10 going to be partners or not?
11   A.   The bigger jobs -- the small jobs we
12 would do separately, the bigger jobs we would get
13 together.
14   Q.   You've identified Mr. Bryant as
15 working for you through Seamless Metals, what
16 does that mean?
17   A.   What does that mean?  Like I said,
18 it's a small company.  Mike Moffit and myself
19 were subcontractors and we switched around.
20 There were employees that would bounce around and
21 work for me, work for Mike Moffit, work for the
22 company itself.  I don't know how else to explain
23 it to you.
24   Q.   These are your words, your
```
32

**Page 33**

```
 1  attorney's words, it says both Mr. Voli, V-O-L-I,
 2  and Mr. Bryant were both working for you through
 3  Seamless Metals?
 4      A.   Through Seamless Metals?
 5      Q.   Yes.
 6      A.   I don't know. I don't know what to
 7  tell you there.
 8      Q.   You have no ownership interest in
 9  Seamless Metals, is that correct?
10      A.   No ownership at all.
11      Q.   Mr. Valentino is not listed in your
12  automatic disclosure as a person who has any
13  knowledge of the incidents as alleged in your
14  complaint?
15      A.   He should be.
16      Q.   Where does he reside?
17      A.   Bristol.
18      Q.   Where?
19      A.   I believe it's Bert Street. I don't
20  know the number.
21      Q.   Say the name again?
22      A.   Bert Street.
23      Q.   Does he live with Mr. Voli?
24      A.   That's the same guy. I don't know
```

**Page 34**

```
 1  how to pronounce his last name or spell it.
 2      Q.   V-O-L-I is Valentino?
 3      A.   Yes.
 4      Q.   That's the same person?
 5      A.   That's the same person, correct.
 6  He's got a tough name. I always just call him
 7  Mikey V.
 8      Q.   Is V-O-L-I a tough name for you to
 9  pronounce or is the name wrong on the document?
10      A.   I'm not sure. I don't know how to
11  spell his last name.
12      Q.   How do you pronounce it?
13      A.   That I'm not sure.
14      Q.   Do you have any pieces of paper with
15  his name on it?
16      A.   No.
17      Q.   I'm going to show you a document and
18  ask if you can identify it.
19      A.   Yes, those are the jobs my father
20  had lined up for me.
21      Q.   Who prepared this document?
22      A.   Who prepared that document? I
23  believe it was Janet Couch.
24      Q.   Do you claim that your father had
```

**Page 35**

```
 1  those jobs lined up for you?
 2      A.   Yes.
 3      Q.   How did you know that?
 4      A.   Because he shows me the jobs ahead
 5  of time. He would take pictures with his digital
 6  camera and show me jobs so I could get an
 7  overlook of it, you know, what I would need as
 8  far as ladders and stuff.
 9      Q.   But there is no documentation that
10  supports the claim that these were lined up prior
11  to this incident?
12      A.   No.
13      Q.   You've never seen any documentation
14  to support that whatsoever?
15      A.   No.
16      Q.   Do you have any recollection as to
17  what the first communication you had with anybody
18  regarding this particular job was?
19      A.   No.
20      Q.   Was it your father?
21      A.   It had to be.
22      Q.   Do you have any recollection as to
23  when you first visited the site?
24      A.   No, I don't remember the exact date.
```

**Page 36**

```
 1      Q.   Were you at the site at any time
 2  before the date of the fall?
 3      A.   I believe the day before.
 4      Q.   Did you ever have any conversations
 5  prior to the date of the fall with anybody
 6  associated with Boland?
 7      A.   Yes.
 8      Q.   Who?
 9      A.   Tom Boland.
10      Q.   Where was the conversation?
11      A.   Down by that little garage or barn
12  or whatever you want to call it.
13      Q.   What was the substance of the
14  conversation?
15      A.   I don't recall. I believe we were
16  just talking about the roof actually, it had to
17  be.
18      Q.   Who was in charge of this job?
19      A.   My father sells it, he's a salesman,
20  and then when I go there, I'm in charge.
21      Q.   Not Mr. Moffit, not your partner?
22      A.   No.
23      Q.   You don't work together on that one?
24      A.   We do work together, you know what I
```

mean? What is the best thing -- I have more knowledge, so I kind of like -- we do work together. It's tough to explain, I guess.
 Q. Are you aware of any written contracts that relate to this project?
 A. How do you mean?
 Q. Do you know what a contract is?
 A. I know what a contract is, yes.
 Q. Are you aware of any written contracts that relate to this project?
 A. No.
 Q. Do you claim there was a written contract for the installation of the roof?
 A. Yes, I actually saw it. The Watstein and Watstein over in -- let's see, how do I say that? He needed a copy of it. I got a copy from Seamless Metal Roofing and I brought a copy to Watstein and Watstein and that is when I saw the contract.
 Q. So the contract that existed with regard to the roof was between Seamless Metal Roofing and whom?
 A. I believe it was Tom Boland, I'm not exactly sure. It's been awhile.

37

 Q. To your knowledge at any point did anybody tell either Boland builders or the owner of the property that it would not be Seamless Metal Roofing but you that would be performing the work on this job, correct?
 A. As far as I know.
 Q. You have the same name as your father, is that fair to state?
 A. Our middle initials are different his is Ernest and mine is Joseph.
 Q. But you're both named Robert Dade?
 A. Yes.
 Q. Is the contract that you saw signed be Robert Dade?
 A. I don't recall. It's been a couple of years.
 Q. Is that the only contract that you're aware of that relates to this project?
 A. Yes.
 Q. How did you know when it was that it was time for you to go out to the site?
 A. When I finished the job beforehand, which I don't remember when that was.
 Q. How did you know that the building

38

would be ready for you to work on?
 A. My father handled that part.
 Q. Your father would tell you it was time to go?
 A. He would say, Bob, you have to bend up this amount of drip edge to get started. I would bend it up and bring it out with a roll and the machine and start the job. He would give me the address. Some times he would drive out there with me and some times he just gave me the address.
 Q. Other than the conversation that you had out at the garage building with Mr. Boland, did you have any other conversations before you began your work on the garage building?
 A. Not that I recall, no.
 Q. Are you aware of whether Mr. Moffit had any kind of conversations with Mr. Boland or anyone from Boland Builders before you began your work on the garage building?
 A. I don't know that answer.
 Q. What was the condition of the house as opposed to the garage building when you first arrived on the site?

39

 A. Well, they had the main building and they put an addition to the left of it, if you're looking at it from the garage. It was new construction obviously. They had tarpaper on the roof. That is as much as I can explain it.
 Q. It's your testimony that the tarpaper was on the roof the first day you were on the site?
 A. I believe so. It was either that or the next morning.
 Q. The next morning would be the day of the incident?
 A. Yes.
 Q. Did you have any discussions with Mr. Boland at any time regarding when it was that you were supposed to begin your work on what you're calling the main building?
 A. Yes.
 Q. What did he tell you?
 A. I went up on the roof, and I was talking to him. I believe if you're looking out from the garage, I would be the closest to the garage, the front of the house to the left. I was standing there talking to him and discussing

40

```
 1     Q.   Had you ever been out of work for
 2 any period of time in the five years prior to
 3 this incident for any injury or ailment other
 4 than the common cold or things like that?
 5     A.   None at all.
 6     Q.   How long do you claim you were out
 7 of work as a result of this incident?
 8     A.   Two months.
 9     Q.   Two months?
10     A.   Yes.
11     Q.   When you went back to work, did you
12 go back to work for yourself?
13     A.   Yes, same working conditions, yes.
14     Q.   And did you have jobs lined up when
15 you went back to work from your dad?
16     A.   Yes.
17     Q.   Do you have any recollection as to
18 what job you went to work on, the first job?
19     A.   None at all.  I believe there was
20 documentation of the checks that I got from them.
21 I don't know if you got them or not.
22     Q.   There's documentation of checks that
23 you got from what?
24     A.   The company.  I believe Weitstein
                                              61
```

```
 1 and Weitstein had me get those, the jobs that I
 2 did after, the job names and the checks.
 3          MS. PELLETIER:  I don't believe we
 4     have those.  Do you recall seeing those?
 5          MR. CVEJANOVICH:  I'll track them
 6     down the best I can, yes.  As we sit here
 7     today, I don't recall seeing any checks.
 8     Q.   (By Ms. Pelletier) What was the
 9 purpose of Mr. Weitstein having those checks?
10     A.   I'm not sure.
11     Q.   Did you get paid the same way as you
12 had before?
13     A.   Yes.
14     Q.   Did you get paid the same amount as
15 you had before?
16     A.   No.
17     Q.   Why not?
18     A.   I worked less hours.  I only worked
19 six hours a day.
20     Q.   Were you provided with some
21 restriction by some health care professional?
22     A.   No, it was just too painful walking
23 on the roof with my injury.
24     Q.   For how long did you only work six
                                              62
```

```
 1 hours a day?
 2     A.   For about eight months.
 3     Q.   Did you ever apply for any kind of
 4 disability?
 5     A.   No.
 6     Q.   Did you claim that you were
 7 disabled?
 8     A.   Do I claim, no.
 9     Q.   After this eight-month period, did
10 you then go back to full time?
11     A.   Yes.
12     Q.   Did you do the same work?
13     A.   No, I only think I worked for not
14 too long after that and I went back to siding.
15     Q.   When you went back to siding, did
16 you go back to siding as yourself as a contractor
17 for Seamless Metal or as an employee of Seamless
18 Metal?
19     A.   I subcontracted.  I'm not sure.  I
20 can't remember.  I think it was a year or two or
21 something.  I'm not even positive.
22     Q.   Why did you make a change to your
23 present job?
24     A.   Because of the injury of my foot.
                                              63
```

```
 1 It was just too much walking on an angle, the
 2 angle of a roof was too much for my foot.
 3     Q.   You didn't have to walk on an angle
 4 doing siding work, right?
 5     A.   Basically you're flat ground on a
 6 plank, the plank is flat like a sidewalk.
 7     Q.   Why did you leave that siding job to
 8 go to the window job?
 9     A.   The terrain around the job, the same
10 thing.  I have to work for a living.  I have to
11 make a living.
12     Q.   You don't have issues with terrain
13 when you do window installation?
14     A.   Yes, sometimes.
15     Q.   What were you making when you were
16 working in the siding as opposed to the roofing?
17     A.   I got paid by the square on that
18 too.  I'm not sure.  I can get my W2 forms, my
19 1099 forms to show that.
20     Q.   Were there activities that you
21 participated in prior to this incident that you
22 were limited in participating in or refrained
23 from participating in as a result of the
24 incident?
                                              64
```