

UNITED DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Hampden, *ss*

Civil Action No. 04 30172 KPN

ROBERT DADE,

          Plaintiff

v.

BOLAND BUILDERS, INC.,
THOMAS BOLAND, STUART HONES
and MARY ROSE JONES,

          Defendants

    DEPOSITION OF: ROBERT DADE, taken before
MYREL J. WILLIAMS, Notary Public and Court
Reporter, pursuant to the applicable
Massachusetts Rules of Civil Procedure, at the
LAW OFFICES OF ROBINSON DONOVAN, P.C., 1500 Main
Street, Springfield, Massachusetts, on January
20, 2006.

            Myrel J. Williams
      Certified Shorthand Reporter -1393S95

1

---

INDEX

WITNESS      DIRECT CROSS REDIRECT RECROSS

Robert Dade    *4  **72

  * By Ms. Pelletier
 ** By Mr. Rider
***By Mr. Cvejanovich

EXHIBITS:             PAGE:

Exhibit 1, document.................. 80
Exhibit 2, photographs............... 93

3

---

APPEARANCES:

FOR THE DEFENDANT:

O'CONNELL, FLAHERTY & ATTMORE
1350 Main Street
Springfield, MA 01103
(413) 747-1773
    BY:  JOHN A. CVEJANOVICH, ESQ.

FOR THE PLAINTIFF:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, MA  01115
(413) 732-2301
    BY: NANCY F. PELLETIER, ESQ.

FOR THE PLAINTIFF:

LAW OFFICES OF JOHN N. WHITE
1500 Main Street, Suite 900
Springfield, MA  01105
(413) 788-0200
    BY:  DANIEL H. RIDER, ESQ.

ALSO PRESENT:  Shawn Breault, Liberty Mutual

2

---

           STIPULATIONS

   It is agreed by and between the parties that
all objections, except objections as to the form
of the questions, and all motions to strike
unresponsive answers are reserved and may be
raised at the time of trial for the first time.

   It is further agreed by and between the
parties that the sealing, and the notification to
all parties of the receipt of the original
deposition transcript is hereby waived.

     ROBERT DADE, Deponent, having first
been duly sworn and identified, deposes and
states as follows:

     MS. PELLETIER:  Before we begin the
deposition, for the record, we were advised
by plaintiff's counsel that he has no form of
identification whatsoever on him.  He left
his driver's license at home and his wallet
is not on him either.  Plaintiff's counsel
has just met him for the first time today so
cannot attest to the fact he is, in fact, the

4

1  plaintiff in this case.
2          We have agreed we will proceed with
3  the deposition and the plaintiff will provide
4  counsel with a colored copy of his driver's
5  license, which he will present to Mr. Rider
6  and myself as well as the stenographer so
7  there can be verification that the person
8  being deposed is the plaintiff.  Is that
9  accurate?
10         MR. CVEJANOVICH:  That's accurate.
11         MR. RIDER:  Fine.
12     Q.    (By Ms. Pelletier)  Can you state
13  your name and present residential address,
14  please?
15     A.    Roger J. Dade, 43 Riving Street,
16  Bristol, Connecticut.
17     Q.    Are you presently employed?
18     A.    Yes, I am.
19     Q.    Were are you employed?
20     A.    J.C. Tonnotte out of Southington.
21     Q.    Can you spell the last name?
22     A.    T-O-N-N-O-T-T-E.
23     Q.    How long have you been employed by
24  J.C. Tonnotte?
                                              5

1      A.    14 months now.
2      Q.    What is J.C. Tonnotte?
3      A.    A window company.
4      Q.    Installation?
5      A.    Yes.
6      Q.    How far did you go in school?
7      A.    Eleventh grade.
8      Q.    Did you have any formal education
9  after that?
10     A.    No.
11     Q.    What is your date of birth?
12     A.    7/12/67.
13     Q.    Your social security number?
14     A.    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.
15     Q.    Have you had any formal training in
16  any trade since you graduated from high school?
17     A.    No.
18     Q.    What did you do in order to prepare
19  for this deposition?
20     A.    What did I do to prepare for this?
21     Q.    Um-hum.
22     A.    Nothing.
23     Q.    Did you review any documents?
24     A.    Wasn't asked to bring any, no.
                                              6

1      Q.    That wasn't my question.  Did you
2  review any documents?
3      A.    Excuse me?
4      Q.    Did you review any documents?  I'm
5  not asking if you were asked to bring any.
6      A.    No.
7      Q.    Other than counsel, did you speak to
8  anybody?
9      A.    No.
10     Q.    Did you tell your employer you were
11  coming to be deposed today?
12     A.    Yes.
13     Q.    What did you tell your or employer?
14     A.    I was coming up here for a
15  deposition.
16     Q.    Did you tell him what it was about?
17     A.    Yes.
18     Q.    What did you tell him?
19     A.    It was for an accident when I fell
20  through a roof.
21     Q.    Did you tell him the details of the
22  accident?
23     A.    Yes, I did.  I told him the builder
24  covered holes he cut out with paper and left
                                              7

1  traps and I walked across and fell through it.
2      Q.    When did you tell him that?
3      A.    Excuse me?
4      Q.    When did you tell him that?
5      A.    When, I think a couple months after
6  I was working for him.
7      Q.    What prompted you to have this
8  conversation?
9      A.    I think we were talking about things
10  about safety and how unsafe it is to cover holes
11  on a roof and this and that.  I can't remember
12  the exact details.
13     Q.    How did that subject come up?
14     A.    I don't recall.
15     Q.    What is the name of the individual
16  you had this conversation with?
17     A.    Mr. Tonnotte.
18     Q.    What's his first name?
19     A.    Joe.
20     Q.    Did you know Mr. Tonnotte before you
21  began working there?
22     A.    No.
23     Q.    Did you tell anybody else who worked
24  at J.C. Tonnotte about this incident?
                                              8

1    A.    Everybody.

2    Q.    Who is everybody?

3    A.    Everybody employed by J.C. Tonnotte.

4    Q.    Who would that be?

5    A.    Tyler, Nick.

6    Q.    Tyler what?

7    A.    I don't know the last name.

8    Q.    You don't know the last name of any

9 of the people you work with?

10   A.    No.

11   Q.    Tyler, Nick?

12   A.    Tyler, Nick, Shawn, that would be

13 Shawn Prescott, Rick Wallace, Rick Sentimont.

14 Who else was there? I believe that is it.

15   Q.    Did you have separate conversations

16 with each of these individuals?

17   A.    I believe it was a group

18 conversation.

19   Q.    How did the subject come up with

20 them?

21   A.    I believe the same thing, we talked

22 about safety issues.

23   Q.    Is there some kind of a seminar or

24 meeting about safety issues?

                                              9

1    A.    Yes, we talk about it once and

2 awhile. Safety is a very important thing.

3    Q.    Did any of these individuals that

4 you just identified ever have any accidents that

5 were --

6    A.    Not to my knowledge.

7         MR. CVEJANOVICH: Wait until she

8    finishes the question.

9    Q.    (By Ms. Pelletier) What did Mr.

10 Tonnotte say when you told him what happened?

11   A.    I don't recall the exact words, but

12 he could not believe that somebody did that, you

13 know.

14   Q.    Did what?

15   A.    Covered the hole on the roof with

16 paper without marking it.

17   Q.    That's what he said?

18   A.    Yes.

19   Q.    He said he could not believe someone

20 covered a hole on a roof without marking it?

21   A.    Exactly.

22   Q.    Where is J.C. Tonnotte located?

23   A.    Southington, 205 Bristol Street.

24   Q.    What did Tyler say?

                                              10

1    A.    I don't recall.

2    Q.    What did Nick say?

3    A.    I don't recall.

4    Q.    What did Shawn say?

5    A.    I don't recall the conversation

6 exactly.

7    Q.    What did Rick say, Rick Wallace?

8    A.    Same to all of them.

9    Q.    Mr. Sentimont, do you recall?

10   A.    No.

11   Q.    Do you have a title at J.C.

12 Tonnotte?

13   A.    Yes, master coiler.

14   Q.    Master coiler?

15   A.    Yes.

16   Q.    Do you need to have a license to be

17 a master coiler?

18   A.    No.

19   Q.    Who gave you that title?

20   A.    Work.

21   Q.    Did you have that title from the day

22 you started working there?

23   A.    No.

24   Q.    Did you start in some other

                                              11

1 capacity?

2    A.    Yes, laborer.

3    Q.    What was your job?

4    A.    Trimming windows.

5    Q.    Do you install windows on roofs?

6    A.    No.

7    Q.    Does J.C. Tonnotte do that at all?

8    A.    I believe they did skylights about

9 eight months ago, but I was not involved, not

10 very often.

11   Q.    What was your job duties as a

12 laborer for J.C. Tonnotte?

13   A.    Trimming windows.

14   Q.    What does that mean?

15   A.    The aluminum casing, the wood -- you

16 put it in, you U-bend or L-bend, put it on, cover

17 it up so you don't have to paint.

18   Q.    Are you performing that activity at

19 a shop or on site?

20   A.    On site.

21   Q.    Did you do residential, commercial

22 or both?

23   A.    Mostly residential, they haven't

24 done commercial since I've worked there.

                                              12

1    Q.    What were you being paid when you
2  first started working there?
3    A.    $16 an hour.
4    Q.    Did you have any benefits?
5    A.    Yes, they have the 401K plan, paid
6  holidays, four weeks vacation, three personal
7  sick days, health insurance.
8    Q.    Had you ever worked as a laborer for
9  a window company before you began with J.C.
10 Tonnotte?
11   A.    No.
12   Q.    For what period of time did you work
13 as a laborer?
14   A.    Excuse me?
15   Q.    For what period of time did you work
16 as a laborer?
17   A.    One year.
18   Q.    And then what was your job?
19   A.    The same job except for I handle all
20 the -- I run all the trim coils.  We've got two
21 crews of two and I handle that.
22   Q.    What does that mean by handle that?
23   A.    Basically like a foreman.
24   Q.    Since you've began working for J.C.
                                    1 3

1  Tonnotte has there been any period of time that
2  you've missed work for anything except for a
3  common cold or illness such as that?
4    A.    No.
5    Q.    Do you claim that any injury or
6  ailment that you suffered as a result of the
7  incident in September of 2001 affects your
8  ability to perform your job at J.C. Tonnotte?
9    A.    Yes, sometimes.  I do a lot of
10 ladder work.
11   Q.    How does it affect your ability to
12 perform your work?
13   A.    My foot gets sore.
14   Q.    How does it affect your ability to
15 perform your work?
16   A.    Going up and down the ladder, yes,
17 it slows me down.
18   Q.    Has there been any occasion on which
19 you were unable to complete a task at work as a
20 result of the injuries you claim you sustained in
21 September of 2001?
22   A.    No.
23   Q.    Have you been reprimanded or warned
24 or given any kind of warning from anybody at J.C.
                                    1 4

1  Tonnotte regarding the performance of your work
2  which was in any way related to the injury you
3  claimed you received in September of 2001?
4    A.    No.
5    Q.    Have you been reprimanded or warned
6  for other reasons?
7    A.    No.
8    Q.    What are you making now?
9    A.    19.
10   Q.    Did it go from 16 to 19 directly or
11 was there some interim stuff?
12   A.    It was two or three months into work
13 and I got a $2 wage increase and then my year
14 review I got another dollar.
15        MS. PELLETIER:  Off the record.
16        (Off record discussion)
17        MS. PELLETIER:  Back on the record,
18   please.  For the record, we have yet to
19   receive any documentation of the loss of
20   earning capacity claim.  Counsel has agreed
21   to obtain tax returns, both state and
22   federal, that were requested in discovery by
23   both parties in this case and provide them to
24   us.
                                    1 5

1        MR. CVEJANOVICH:  Yes.
2    Q.    (By Ms. Pelletier)  Prior to working
3  at J.C. Tonnotte, where did you work?
4    A.    I was self-employed.  I
5  subcontracted for Seamless Metal Roofing Company.
6    Q.    You were self-employed and you
7  subcontracted from Seamless Metal --
8    A.    Roofing Company.
9    Q.    -- Roofing Company.  And what were
10 you doing as your job?
11   A.    Installing metal roofs.
12   Q.    How long were you self-employed in
13 that capacity?
14   A.    I believe it was two years all
15 together.  It was one year and then the year
16 before that I subcontracted doing siding with
17 Peter O'Brown.  Before that was Seamless Metal
18 and the year before that was Peter O'Brown again.
19   Q.    When did you first start doing work
20 installing metal roofs?
21   A.    I believe I was 22.
22   Q.    Do you know what year that would
23 have been?
24   A.    I'm 38 now, so that's 16 years ago,
                                    1 6

1 1990.

2    Q.    What, if any, training did you
3 receive?

4    A.    I was just trained by my father and
5 his employer Doug Couch.

6    Q.    So was your father also an installer
7 at Seamless Metal Roofs?

8    A.    Yes.

9    Q.    Since that time have you ever
10 received any additional training from anybody?

11    A.    No.

12    Q.    What was the training that you
13 received from your father and his employer?

14    A.    They showed me how to applicate it.

15    Q.    Did you ever have any safety
16 training?

17    A.    No, I was always taught to be safe
18 though.  I always set a ladder upright.  I don't
19 use staging that's faulty.  I don't use the skill
20 saw if the guard doesn't work, nail gun if the
21 safety doesn't work.  I don't use that.  I was
22 taught always to be safe actually.

23    Q.    Did you work for your father's
24 employer for some period of time?

17

1    A.    Yes, I actually worked for -- for
2 Doug Couch.

3    Q.    Spell the last name?

4    A.    C-O-U-C-H.

5    Q.    Did he have a company or just Doug
6 Couch?

7    A.    Yeah, first he had a siding company,
8 which was Seamless Siding and Gutters and then he
9 went into the roofing business, which is called
10 Seamless Metals.

11    Q.    When you first started working for
12 him, were you working for Seamless Metal or
13 Seamless Siding?

14    A.    Seamless Siding.

15    Q.    Were you actually employed by him?

16    A.    Yes, I was working by the hour at
17 that time.

18    Q.    At some point you stopped working
19 for him as an employee and began working for him
20 as an independent contractor?

21    A.    Yes, I was 17 years old.  Actually,
22 I was 17 years old I first started
23 subcontracting.  Then when I was 22, I started
24 working by the hour.  I worked by the hour for

18

1 three or four years and then I went back to
2 subcontracting.

3    Q.    Did you have any written agreement
4 with Mr. Couch?

5    A.    Written agreement as to what?

6    Q.    Did you with him?

7    A.    Can you give me more information?  I
8 don't understand the question.

9    Q.    When you were a subcontractor, did
10 you have any written arrangement with Mr. Couch
11 as to how you would get paid, the hours you would
12 work, what jobs you would work?

13    A.    No.

14    Q.    Nothing?

15    A.    No, no, nothing written.

16    Q.    When you first started working as a
17 subcontractor for Mr. Couch, how were you paid?

18    A.    I was paid by the square, that's a
19 10 by 10 area.

20    Q.    Did he continue to operate Seamless
21 Metal Roofing with his own employees when you
22 were working as an independent contractor?

23    A.    Yes.

24    Q.    Did you ever go out and bid any jobs

19

1 for Mr. Couch?

2    A.    No.

3    Q.    The job that we're here to talk
4 about, is that a job that was arranged by
5 Seamless Metal Roofing or you or who?

6    A.    Seamless Metal Roofing.

7    Q.    Did you ever advise anybody at
8 Boland Builders that you were not employed by
9 Seamless Metal Roofing?

10    A.    No.

11    Q.    Did you bid the job?

12    A.    No.

13    Q.    Who did?

14    A.    My father, Robert Dade.

15    Q.    So was your father acting for
16 Seamless Metal Roofing or you?

17    A.    Yes.

18    Q.    So your father, Robert Dade, went
19 out and bid the job for Seamless Metal Roofing?

20    A.    Correct.

21    Q.    Then you showed up to do the job as
22 an independent contractor?

23    A.    I'm a subcontractor.

24    Q.    But you never told anybody that you

20

1 were a subcontractor, is that correct?
2    A.    Yes.
3    Q.    Did your father ever tell anybody
4 that Seamless Metal Roofing wasn't the entity
5 that was going to be performing the work?
6    A.    Not to my knowledge.  I wasn't
7 there.
8    Q.    Did you have a corporation or
9 partnership or any kind of an entity that you
10 worked under as an independent -- as a
11 subcontractor?
12    A.    What do you mean partner?
13    Q.    How did you get paid by Seamless
14 Metal Roofing for the job that's the subject
15 matter of this case?
16    A.    Excuse me, say it again?
17    Q.    How did you get paid by Seamless
18 Metal Roofing for the job that forms the subject
19 matter of this case?
20    A.    The job I got hurt on?
21    Q.    Yeah.
22    A.    I didn't get paid for that job.  I
23 fell through the roof and got hurt.  You don't
24 work, you don't get paid.
                                    2 1

1    Q.    When you were hired by Seamless
2 Metal Roofing to perform that job, was there
3 anything in writing between you and Seamless
4 Metal Roofing?
5    A.    No.
6    Q.    What was the arrangement between
7 Seamless Metal Roofing and you in connection with
8 this job?
9    A.    I do the job.  I get paid when it's
10 half done -- I get paid half when it's half done
11 and when it's finished, I get paid the other
12 half.
13    Q.    You personally?
14    A.    Yes, by check.
15    Q.    The check is written to Robert Dade?
16    A.    Yes.
17    Q.    Not any kind of corporation or
18 anything like that?
19    A.    Not at all.  I didn't get any check
20 from that job because, you know, I didn't do the
21 job.  I worked one day on it.  Actually, a day
22 and a half.
23    Q.    How much were you supposed to be
24 paid according to you?
                                    2 2

1    A.    It was $150 per square.
2    Q.    That's to you personally?
3    A.    Yes.
4    Q.    Did that include -- strike that.
5          How many buildings were you putting
6 roofs on at the subject location?
7    A.    There were two buildings.  There was
8 some kind of garage-type building and then the
9 main building, which had an addition.
10    Q.    Was the 150 per square for both
11 buildings?
12    A.    Yes.
13    Q.    Did you perform any work on the
14 garage building?
15    A.    Yes.
16    Q.    Did you get paid for that?
17    A.    Yes.
18    Q.    How much?
19    A.    150 per square.
20    Q.    How much?
21    A.    Whatever the squares were.
22    Q.    You don't remember?
23    A.    No, I don't remember.  I believe the
24 garage was probably about two and a half or three
                                    2 3

1 square.  I've done so many roofs it's kind of
2 hard to remember the exact size of them all.
3    Q.    Did you have any employees at any
4 time?
5    A.    Yes.
6    Q.    As of the date of this incident,
7 who are you employees?
8    A.    Mike Valentino.  I don't know if I
9 am pronouncing that right.
10         MR. RIDER:  With a V?
11         THE WITNESS:  Yeah, V.  And then I
12   believe it was Keith Bryant, and there might
13   have been one other guy.  I don't recall.
14    Q.    (By Ms. Pellieter)  If these were
15 employees, is it safe to assume you provided them
16 with W2s?
17    A.    I paid them under the table.
18    Q.    Have you ever advised the Sate of
19 Connecticut since that time that you were doing
20 that?
21    A.    No.
22    Q.    How much did you pay Mike Valentino?
23    A.    I think it was $12 an hour.  I'm not
24 exactly sure.
                                    2 4

1    Q.    How about Keith Bryant?
2    A.    I think it was about the same.
3    Q.    How long had Mike Valentino worked
4 for you?
5    A.    I believe about six months.
6    Q.    What, if any, experience did he have
7 in installing seamless metal roofs before that?
8    A.    He was working for the company, I
9 think, for two years before that.
10    Q.    The company meaning Seamless Metal
11 Roofing?
12    A.    Yes.
13    Q.    What about Keith Bryant?
14    A.    Keith Bryant actually had more
15 experience than that.  I believe it was about six
16 or seven.  I'm not exactly sure.
17    Q.    Six or seven what?
18    A.    Years.
19    Q.    Did he also work for Seamless Metal
20 Roofing?
21    A.    Yes, he also worked for Seamless
22 Siding too, as well.  The company switched.  He
23 went from one thing to the other.
24    Q.    Did you ever get a 1099 from

25

1 Seamless Metal Roofing?
2    A.    Yes.
3    Q.    Who is Michael Moffit?
4    A.    Who is he?
5    Q.    Um-hum.
6    A.    He was our employee at Seamless
7 Metals.
8    Q.    Employee?
9    A.    Employee.  Well, he would
10 subcontract as well.  On the bigger jobs we went
11 together and then we did separate ones.
12    Q.    I'm a little confused as to how this
13 arrangement works.  How would somebody decide
14 whether Seamless would be at the site or you or
15 Seamless or somebody who used to work at
16 Seamless, how would that work?
17    A.    How do you mean?
18    Q.    This job, let's talk about this job.
19    A.    This job, okay.
20    Q.    You made an allegation that you
21 were, as of today, the subcontractor of Seamless
22 Metal Roofing hired to do the work at this site,
23 is that right?
24    A.    Right.

26

1    Q.    And that your father was working for
2 Seamless Metal Roofing at the time and he went
3 out and he priced the job?
4    A.    Sure, he's a salesman at Seamless
5 Metal Roofing.
6    Q.    At some point you go out to this
7 site to perform some work, correct?
8    A.    Yes.
9    Q.    Because at some point you get hired
10 by Seamless Metal roofing to do something,
11 correct?
12    A.    Yes.
13    Q.    What did you get hired to do?
14    A.    To do the roof.
15    Q.    What does that mean?
16    A.    That means I go to the job and then
17 we bring a machine and we measure how long the
18 roof panels are.
19    Q.    We who?
20    A.    Me and a couple of the guys who were
21 working for me, Mike and Keith and someone else
22 and Michael Moffit too.
23    Q.    Well, Michael Moffit wasn't working
24 for you?  That is where I'm getting confused

27

1 here.
2    A.    He's a subcontractor as well.  We
3 both subcontract all the time.  On bigger jobs we
4 would get together and do it together.
5    Q.    What were the arrangements between
6 you and Michael Moffit as to who was going to do
7 what on this job?
8    A.    We all worked together.
9    Q.    So you --
10    A.    As a team.
11    Q.    So you and Mr. Moffit both
12 subcontracted with no written agreement to work
13 as a team on this job?
14    A.    Yes.
15    Q.    How much did he get paid?
16    A.    Half.
17    Q.    Half of what?
18    A.    We split it down the middle.
19    Q.    So if it was 150 square?
20    A.    Say it was $5,000 --
21    Q.    Is 150 squares just for you or is
22 150 squares divided by two because Mr. Moffit got
23 half?
24    A.    75 and 75, Mr. Moffit got half.

28

1    Q.    So you did not get 150 as testified?
2    A.    You asked how much I get paid.
3    Q.    Then you said 150 square.  You did
4 not, you got half of that, correct?
5    A.    Yes, on that particular job, yes.
6    Q.    Did Mr. Moffit have any employees?
7    A.    Yes, we used the same guys and
8 rotated them around.
9    Q.    On this job who paid Mr. Valentino
10 and from Mr. Bryant?
11    A.    We both paid them.  We took it off
12 the top.  Actually, I only did the garage, so he
13 paid them himself for the main building.
14    Q.    How many times did you work under
15 the arrangement that you just described with
16 Seamless Roofing and Seamless Metal Roofing and
17 Mike Moffit?
18    A.    I don't recall exactly, but probably
19 about 20 or more jobs.
20    Q.    You've made allegations in this case
21 that you had to forego -- you personally, 12 jobs
22 as a result of the injury that you suffered in
23 this case, are you aware of that?
24    A.    Yes.

29

1 Seamless Roofing, correct?
2    A.    Yes.
3    Q.    Do you have any documents whatsoever
4 that support your claim that you have any loss of
5 earning capacity as a result of the injuries you
6 sustained in September of 2001?
7    A.    No.
8    Q.    Who is Michael --
9        MR. CVEJANOVICH:  Note an objection.
10    That's in part a legal question.
11    Q.    (By Ms. Pelletier)  Michael V-O-L-I?
12    A.    Who is he?
13    Q.    Yes.
14    A.    He's one of the employees.
15    Q.    One of whose employees?
16    A.    He worked for me and Mike Moffit.
17    Q.    You've identified Mr. Voli as a
18 person who has knowledge of the incident as
19 alleged in your complaint and also indicated that
20 he's expected to testify as to the condition of
21 the roof and to what he witnessed, do you
22 understand that?
23    A.    Yes.
24    Q.    You also identified Mr. Moffit as

31

1    Q.    One of the jobs is identified as
2 D-U-B-R-A-Y, are you familiar with that?
3    A.    No, I don't recall.
4    Q.    Do you recall a single job that you
5 claim that you were required to forego?
6    A.    Do I, no.
7    Q.    Do you have any documentation to
8 show that you had been hired by Seamless Metal
9 Roofing to perform any job that you claim you
10 were required to forego?
11    A.    No, there is nothing written like I
12 told you before.
13    Q.    So there's no documentation to claim
14 you were to forego any job that you were required
15 to forego a single job, as a result of the
16 injuries you claim you sustained in September of
17 2001, is that correct?
18    A.    Yes.
19    Q.    In fact, you indicated that Mr.
20 Moffit ended up doing the jobs that you were
21 required to forego?
22    A.    Yes.
23    Q.    Mr. Moffit was all ready working as
24 a subcontractor prior to this incident for

30

1 being your partner at the time of this incident,
2 are you aware of that?
3    A.    Yes.
4    Q.    Was Mr. Moffit your partner?
5    A.    Yes, sometimes we'd be partners and
6 sometimes we wouldn't.
7    Q.    On this job was he your partner?
8    A.    Yes, we were partners.
9    Q.    How did you decide whether you were
10 going to be partners or not?
11    A.    The bigger jobs -- the small jobs we
12 would do separately, the bigger jobs we would get
13 together.
14    Q.    You've identified Mr. Bryant as
15 working for you through Seamless Metals, what
16 does that mean?
17    A.    What does that mean?  Like I said,
18 it's a small company.  Mike Moffit and myself
19 were subcontractors and we switched around.
20 There were employees that would bounce around and
21 work for me, work for Mike Moffit, work for the
22 company itself.  I don't know how else to explain
23 it to you.
24    Q.    These are your words, your

32

1 attorney's words, it says both Mr. Voli, V-O-L-I,
2 and Mr. Bryant were both working for you through
3 Seamless Metals?
4     A.     Through Seamless Metals?
5     Q.     Yes.
6     A.     I don't know.  I don't know what to
7 tell you there.
8     Q.     You have no ownership interest in
9 Seamless Metals, is that correct?
10     A.     No ownership at all.
11     Q.     Mr. Valentino is not listed in your
12 automatic disclosure as a person who has any
13 knowledge of the incidents as alleged in your
14 complaint?
15     A.     He should be.
16     Q.     Where does he reside?
17     A.     Bristol.
18     Q.     Where?
19     A.     I believe it's Bert Street.  I don't
20 know the number.
21     Q.     Say the name again?
22     A.     Bert Street.
23     Q.     Does he live with Mr. Voli?
24     A.     That's the same guy.  I don't know

                                              33

1 how to pronounce his last name or spell it.
2     Q.     V-O-L-I is Valentino?
3     A.     Yes.
4     Q.     That's the same person?
5     A.     That's the same person, correct.
6 He's got a tough name.  I always just call him
7 Mikey V.
8     Q.     Is V-O-L-I a tough name for you to
9 pronounce or is the name wrong on the document?
10     A.     I'm not sure.  I don't know how to
11 spell his last name.
12     Q.     How do you pronounce it?
13     A.     That I'm not sure.
14     Q.     Do you have any pieces of paper with
15 his name on it?
16     A.     No.
17     Q.     I'm going to show you a document and
18 ask if you can identify it.
19     A.     Yes, those are the jobs my father
20 had lined up for me.
21     Q.     Who prepared this document?
22     A.     Who prepared that document?  I
23 believe it was Janet Couch.
24     Q.     Do you claim that your father had

                                              34

1 those jobs lined up for you?
2     A.     Yes.
3     Q.     How did you know that?
4     A.     Because he shows me the jobs ahead
5 of time.  He would take pictures with his digital
6 camera and show me jobs so I could get an
7 overlook of it, you know, what I would need as
8 far as ladders and stuff.
9     Q.     But there is no documentation that
10 supports the claim that these were lined up prior
11 to this incident?
12     A.     No.
13     Q.     You've never seen any documentation
14 to support that whatsoever?
15     A.     No.
16     Q.     Do you have any recollection as to
17 what the first communication you had with anybody
18 regarding this particular job was?
19     A.     No.
20     Q.     Was it your father?
21     A.     It had to be.
22     Q.     Do you have any recollection as to
23 when you first visited the site?
24     A.     No, I don't remember the exact date.

                                              35

1     Q.     Were you at the site at any time
2 before the date of the fall?
3     A.     I believe the day before.
4     Q.     Did you ever have any conversations
5 prior to the date of the fall with anybody
6 associated with Boland?
7     A.     Yes.
8     Q.     Who?
9     A.     Tom Boland.
10     Q.     Where was the conversation?
11     A.     Down by that little garage or barn
12 or whatever you want to call it.
13     Q.     What was the substance of the
14 conversation?
15     A.     I don't recall.  I believe we were
16 just talking about the roof actually, it had to
17 be.
18     Q.     Who was in charge of this job?
19     A.     My father sells it, he's a salesman,
20 and then when I go there, I'm in charge.
21     Q.     Not Mr. Moffit, not your partner?
22     A.     No.
23     Q.     You don't work together on that one?
24     A.     We do work together, you know what I

                                              36

1 mean?  What is the best thing -- I have more
2 knowledge, so I kind of like -- we do work
3 together.  It's tough to explain, I guess.
4        Q.    Are you aware of any written
5 contracts that relate to this project?
6        A.    How do you mean?
7        Q.    Do you know what a contract is?
8        A.    I know what a contract is, yes.
9        Q.    Are you aware of any written
10 contracts that relate to this project?
11       A.    No.
12       Q.    Do you claim there was a written
13 contract for the installation of the roof?
14       A.    Yes, I actually saw it.  The
15 Watstein and Watstein over in -- let's see, how
16 do I say that?  He needed a copy of it.  I got a
17 copy from Seamless Metal Roofing and I brought a
18 copy to Watstein and Watstein and that is when I
19 saw the contract.
20       Q.    So the contract that existed with
21 regard to the roof was between Seamless Metal
22 Roofing and whom?
23       A.    I believe it was Tom Boland, I'm not
24 exactly sure.  It's been awhile.

                                                    3 7

1        Q.    To your knowledge at any point did
2 anybody tell either Boland builders or the owner
3 of the property that it would not be Seamless
4 Metal Roofing but you that would be performing
5 the work on this job, correct?
6        A.    As far as I know.
7        Q.    You have the same name as your
8 father, is that fair to state?
9        A.    Our middle initials are different
10 his is Ernest and mine is Joseph.
11       Q.    But you're both named Robert Dade?
12       A.    Yes.
13       Q.    Is the contract that you saw signed
14 be Robert Dade?
15       A.    I don't recall.  It's been a couple
16 of years.
17       Q.    Is that the only contract that
18 you're aware of that relates to this project?
19       A.    Yes.
20       Q.    How did you know when it was that it
21 was time for you to go out to the site?
22       A.    When I finished the job beforehand,
23 which I don't remember when that was.
24       Q.    How did you know that the building

                                                    3 8

1 would be ready for you to work on?
2        A.    My father handled that part.
3        Q.    Your father would tell you it was
4 time to go?
5        A.    He would say, Bob, you have to bend
6 up this amount of drip edge to get started.  I
7 would bend it up and bring it out with a roll and
8 the machine and start the job.  He would give me
9 the address.  Some times he would drive out there
10 with me and some times he just gave me the
11 address.
12       Q.    Other than the conversation that you
13 had out at the garage building with Mr. Boland,
14 did you have any other conversations before you
15 began your work on the garage building?
16       A.    Not that I recall, no.
17       Q.    Are you aware of whether Mr. Moffit
18 had any kind of conversations with Mr. Boland or
19 anyone from Boland Builders before you began your
20 work on the garage building?
21       A.    I don't know that answer.
22       Q.    What was the condition of the house
23 as opposed to the garage building when you first
24 arrived on the site?

                                                    3 9

1        A.    Well, they had the main building and
2 they put an addition to the left of it, if you're
3 looking at it from the garage.  They had new
4 construction obviously.  They had tarpaper on the
5 roof.  That is as much as I can explain it.
6        Q.    It's your testimony that the
7 tarpaper was on the roof the first day you were
8 on the site?
9        A.    I believe so.  It was either that or
10 the next morning.
11       Q.    The next morning would be the day of
12 the incident?
13       A.    Yes.
14       Q.    Did you have any discussions with
15 Mr. Boland at any time regarding when it was that
16 you were supposed to begin your work on what
17 you're calling the main building?
18       A.    Yes.
19       Q.    What did he tell you?
20       A.    I went up on the roof, and I was
21 talking to him.  I believe if you're looking out
22 from the garage, I would be the closest to the
23 garage, the front of the house to the left.  I
24 was standing there talking to him and discussing

                                                    4 0

1 the roof.  I said I would measure the drip edge
2 to get the final amount.  My father gives me the
3 amounts to start with.  I go measure how much
4 more I need.  He said he had skylights going in
5 and I said, okay, that's no problem.  He asked me
6 about the flashings.  I said the flashing is no
7 problem, we bend our own flashing, just when you
8 put the skylights in, we'll flash accordingly and
9 put the roof on.  He pointed towards the area on
10 the flat roof on the other side.  He never
11 mentioned he had the wood cut out and it was
12 papered at the time so I had no knowledge that
13 those holes were there.  That is basically it.
14      Q.    The question that I asked you sir
15 was about a conversation as to when you would
16 begin your work on that building?
17      A.    I'm sorry, I got sidetracked.  I
18 believe that was a Friday, if I'm remembering
19 right, it would be the following Monday.
20      Q.    So he told you that you would not
21 begin your work until the following Monday?
22      A.    No, he asked me when would you be
23 starting the main roof and I told him on Monday.
24      Q.    What was the date Monday?

41

1      A.    I don't recall.
2      Q.    So your testimony is that --
3      A.    That would the 10th.
4      Q.    So you told Mr. Boland that you
5 would not begin your work until the 10th of
6 September 2001?
7      A.    Right.
8      Q.    You told him that prior to your
9 fall?
10      A.    Yes.
11      Q.    You told him that while you were
12 standing on the roof?
13      A.    Yes.
14      Q.    After he told you that there were
15 skylights going in?
16      A.    Yes.
17      Q.    You believe that that conversation
18 took place on a Friday?
19      A.    Yes, I believe so.
20      Q.    Was that the same day you claim you
21 fell?
22      A.    Yes, it was the same day I fell,
23 that's for sure.
24      Q.    Let's go back and talk about the day

42

1 that you fell beginning with your arrival on the
2 site, and that is September 7th 2001, correct?
3      A.    Yes.
4      Q.    Tell me everything you can recall
5 happening from the time you arrived on September
6 7th 2001 until the time of your fall?
7      A.    We arrived in the morning.  We had
8 the top part of the barn or garage to do because
9 it's shaped with the sides up like that and the
10 top like that, we had to finish the top.  At the
11 time we got finished with the top of it, or I
12 think before we finished, I went up to talk to
13 Tom about 10 o'clock in the morning or something
14 like that.  I talked to him.  I went back down.
15 We finished that up and then I had to get the
16 amount of drip edge I need.  I went to talk to
17 Mike Moffit.
18      Q.    When you went up to talk to Tom,
19 where did you go?
20      A.    I went on the roof.  That is where
21 he was working with -- I think another guy was
22 working with him.
23      Q.    Is that the conversation that you
24 just described?

43

1      A.    Yes.
2      Q.    So you went up on the roof
3 approximately 10 o'clock in the morning.  You had
4 a conversation with Mr. Boland and he advised you
5 there were skylights going in that roof and then
6 you came off the roof and you went back to the
7 barn area?
8      A.    Yes.
9      Q.    What happened after that?
10      A.    Well, we finished up the barn and
11 then Mike Moffit and I went back up to the main
12 building and we began to measure the drip edge so
13 we'd get the right amount.
14      Q.    Who was there besides you and Mike
15 Moffit?
16      A.    Mickey V.
17      MR. CVEJANOVICH:  For the record,
18 you mean on the job or on the roof where he
19 fell.
20      MS. PELLETIER:  No one said he was
21 on the roof at the time he was measuring the
22 drip edge.
23      THE WITNESS:  Well, I was on -- you
24 have to be on -- you don't have to, but we do

44

1   it on the roof to get a more accurate
2   footage.
3            MR. CVEJANOVICH:  Generally who's
4   on the job site you're asking?
5        Q.    (By Ms. Pelletier)  I'm asking who
6   was doing the measurement?
7        A.    Mike Moffit and I.
8        Q.    Where was Mr. Boland?
9        A.    He was not on the job site, he left.
10       Q.    So the last conversation that you
11  had with Mr. Boland prior to you going back on
12  the roof was that you were going to begin the
13  roof on September 10th?
14       A.    Correct.
15       Q.    Mr. Boland was not there when you
16  decided to go back on the roof after that
17  conversation, correct?
18       A.    Right.
19       Q.    He had no knowledge you went back up
20  on the roof at that time, correct?
21       A.    I'm not sure if I told him I needed
22  to get the footage of the drip edge or not.  I
23  might have.  I might not have.
24       Q.    He certainly wasn't there?

45

1        A.    He certainly was not there.
2        Q.    Do you know where he was?
3        A.    No.
4        Q.    Did you have any conversations with
5   Mr. Boland at any time while you were inside of
6   the building?
7        A.    No, not to my knowledge.  I don't
8   even think I went inside the building but maybe
9   once.
10       Q.    What did you do when you were inside
11  the building?
12       A.    I'm not even sure.  I'm not even
13  sure if I went inside the building.  I know I was
14  inside when I fell through it.
15       Q.    You were telling me about being back
16  on the roof with Mike Moffit measuring the
17  flashing?
18       A.    Yes, drip edge, um-hum.
19       Q.    Did you ever have any conversations
20  with Mr. Boland about the appropriate type of
21  flashing to use when installing skylights on a
22  roof that was going to be a metal roof?
23       A.    Yeah, that was part of our
24  discussion.  I said we would bend our own.  They

46

1   have kits that come with the skylights, but that
2   is for roofing shingles.  We build a full length
3   instead of having all these pieces.  That is
4   basically how that works.
5        Q.    Did you ever have any conversations
6   with Mr. Boland while inside the building?
7        A.    No.
8        Q.    Did you ever have any conversation
9   inside the building while Mr. Stuart Jones was
10  present?
11       A.    I'm not sure.  I remember talking to
12  him, but I'm not sure if it was inside the
13  building or not.
14       Q.    Do you have any recollection of
15  having the skylights pointed out to you while you
16  were inside the building?
17       A.    No, not at all.  If I would have
18  seen -- can I go on?
19       Q.    Sure.
20       A.    If I would have seen the skylights
21  were papered like that from underneath, I would
22  have asked him to cut them out or I would have
23  plywood them myself because it's just a safety
24  thing, you know.

47

1        Q.    It's a safety thing for who?
2        A.    Anybody, his workers, me, anybody
3   that goes up on that roof, even Tom Boland
4   himself.  You can call that like a trap like they
5   used to do with bears and lions.  They dug a hole
6   and camouflaged it and they walked across and
7   fell through.
8        Q.    You agree with me, sir, you knew
9   there were skylights going in the roof if you
10  didn't know there were holes there, right?
11       A.    I knew there were skylights.  I
12  didn't know there were holes.
13       Q.    You knew there were skylights when
14  you went back on the roof a second time on
15  September 7, 2001?
16       A.    Yes.
17       Q.    What, if any, steps did you take to
18  determine whether or not the holes had been cut
19  out?
20       A.    I didn't see any reason for anyone
21  to cut a hole before they put the skylight in.
22       Q.    That's not my question.  What, if
23  anything, did you do to determine that the holes
24  had been cut out?

48

1    A.    What did I do, nothing.
2    Q.    What did Mr. Moffit do?
3    A.    Nothing.
4    Q.    Was Mr. Moffit present when Mr.
5 Boland advised you that there was going to be
6 skylights in the building?
7    A.    No.
8    Q.    It was just you and Mr. Boland?
9    A.    Yes.
10    Q.    Did you tell Mr. Moffit before you
11 went up on the roof that there were going to be
12 skylights?
13    A.    Yes.
14    Q.    He didn't do anything to figure out
15 if they'd been cut out yet?
16    A.    No.
17    Q.    To your knowledge was Mr. Moffit
18 ever on the inside of the building?
19    A.    I'm not sure.
20    Q.    Did you request permission of
21 anybody prior to going on the roof the second
22 time?
23    A.    I don't believe I need permission
24 to --

                                           4 9

1    Q.    That's not my question, sir.  Did
2 you request permission to anyone --
3    A.    No.
4    Q.    You need to wait until I complete
5 the question.  Did you request permission of
6 anyone prior to going on the roof a second time?
7    A.    No.
8    Q.    Did you advise anyone on the site
9 you were going on the roof a second time?
10    A.    No.
11    Q.    What happened when you went on the
12 roof the second time?
13    A.    We began to measure the drip edge on
14 the far side of the building, the furthest away
15 from the garage.  We started to come this way.
16 One guy holds the ruler on one end, we rule it
17 out, take the measure.   We got to the other
18 side, started to walk across with the ruler, and
19 I was falling through.
20    Q.    Do you remember where you landed?
21    A.    I landed on the plywood, I believe
22 that would be the kitchen.
23    Q.    Do you have any recollection of
24 having ever been in that kitchen before?

                                           5 0

1    A.    No.
2    Q.    How did you know it was the kitchen?
3    A.    I was told afterwards.
4    Q.    By whom?
5    A.    I don't recall.
6    Q.    What happened when you landed?
7    A.    Well, I tried -- when I was falling
8 through, I knew what was going on right away.  I
9 knew this guy cut the skylights out.  So it was
10 all black and then I could see something, like
11 this big silver thing.  I don't know if it was a
12 vacuum or whatever.  I tried to kick it out of my
13 way.  I think I landed feet first and then I went
14 to my rear.  I hit my nose on the way through so
15 I was bleeding through the nose.  The homeowner,
16 the wife, she gave me a rag for my nose.  I held
17 that and I laid there.  I could tell -- I could
18 feel the pain in my foot.  They called the
19 ambulance and the ambulance came and carried me
20 to the house and put me in the ambulance and
21 brought me to Noble Hospital.
22    Q.    Did you have any conversations with
23 Mrs. Jones after you fell through the roof?
24    A.    Yes.

                                           5 1

1    Q.    What did you say --
2    A.    Yes, I told her -- I said, I can't
3 believe they cut the holes out.  I kept saying
4 over and over.  She said, I know, I know, I don't
5 know why he did that.  I don't know why he did
6 that.
7    Q.    Mrs. Jones said that?
8    A.    Yes, I remember that very
9 distinctly.
10    Q.    Who else was present when that
11 conversation allegedly took place?
12    A.    I believe Mikey V was there.  He
13 heard me fall through the roof.  He was on the
14 bar.  He said he was there like in no time.
15 That is what he told me.
16    Q.    When did you talk to him about it?
17    A.    I'm not sure if it was in the
18 hospital or after.
19    Q.    Did you have any conversations with
20 Mr. Jones?
21    A.    Not that I recall.
22    Q.    Do you recall ever telling Mrs.
23 Jones that you forgot that the skylights had been
24 cut out?

                                           5 2

1    A.    Yes.  I didn't tell her that at all.

2    Q.    Do you know that she stated that you

3 told her that?

4    A.    Yeah, I heard that, yes.

5    Q.    Who did you hear that from, and if

6 it was your attorney don't tell me.  Strike that.

7          Did you ever hear that Mrs. Jones

8 stated that you said words to the effect that you

9 forgot the skylights were there from anyone other

10 than counsel?

11    A.    No.

12    Q.    Did you ever have any conversations

13 with Mr. Jones after you fell?

14    A.    I don't believe I did.  I know that

15 they had called the hospital.  I don't know if I

16 had talked to him or if it was my future wife,

17 which I'm married now.

18    Q.    What is her name?

19    A.    Denise.

20    Q.    Were they conversations about your

21 condition or about the incident?

22    A.    Yeah, they wanted to know how I was

23 doing, my well-being.

24    Q.    Other than this conversation that

5 3

1 incident?

2    A.    Yeah, Mike V, Mike Moffit.

3    Q.    What did you say and what did they

4 say?

5    A.    I don't remember exact words, who

6 went what, but we talked about how we could not

7 believe how the guy cut the holes out and covered

8 it with paper.  That was the conversation.

9    Q.    Did you ever tell either of these

10 individuals that Mr. Boland had told you that

11 there were skylights in that roof?

12    A.    Yes, I told them how the

13 conversation went and how he pointed 20 to 30

14 feet away where the skylights were, and the

15 skylights were five feet away from us.

16    Q.    But nobody was there except you and

17 Mr. Boland, right?

18    A.    Yes, and I believe there were one of

19 his workers on the roof, but I think he was like

20 10, 12 feet away.

21    Q.    Did you ever go back to the site?

22    A.    No.

23    Q.    Did you ever have any conversations

24 with your father about the incident?

5 5

1 you've described with Mrs. Jones immediately

2 after the fall and the possible conversations

3 regarding your well-being, did you ever have any

4 other conversations with Mr. or Mrs. Jones?

5    A.    No.

6    Q.    Did you ever have any conversations

7 with Mr. Boland regarding the incident?

8    A.    No, he had called the hospital, but

9 I didn't want to talk to him.

10    Q.    So since the date of the fall you

11 have not had any conversations with Mr. Boland?

12    A.    No.

13    Q.    Have you had any conversations with

14 Mr. Bryant about this incident?

15    A.    Any conversations, yeah, I'm sure

16 we've talked about it.

17    Q.    What did you say and what did he

18 say?

19    A.    I don't really recall.  You know,

20 we were talking about the accident, you know,

21 falling through the roof.  I don't know how else

22 to -- actually I don't remember the conversation.

23    Q.    Did you ever have any conversations

24 with anyone else that was on the site about the

5 4

1    A.    Yes.

2    Q.    What did you say and what did he

3 say?

4    A.    They were basically the same

5 conversation about the hole being covered with

6 the paper.

7    Q.    Did you tell him that the

8 contractor, Mr. Boland, had told you that there

9 were skylights in that roof?

10    A.    Yes.

11          MR. CVEJANOVICH:  Objection.  The

12    testimony speaks for itself.  On the

13    transcript, I believe, Mr. Dade said that Mr.

14    Boland told him they were going to be --

15          MS. PELLETIER:  I don't want you

16    coaching the witness.  He's testified.

17          MR. CVEJANOVICH:  I don't want you

18    putting words in his mouth.  The transcript

19    speaks for itself.

20          MS. PELLETIER:  It certainly does.

21          MR. CVEJANOVICH:  I don't want you

22    warping the transcript.

23          MS. PELLETIER:  I'm not warping the

24    transcript.  I'm asking questions.

5 6

1    MR. CVEJANOVICH:  It's not going to
2  be warped in the transcript, that's for sure.
3    MS. PELLETIER:  I'm not warping the
4  transcript.  I'm asking questions that he
5  doesn't have to answer the way he did.
6    Q.    (By Ms. Pelletier)  When you decided
7  to go up on the roof the second time on September
8  7th 2001, how did you get up there?
9    A.    A ladder.
10   Q.    Whose ladder?
11   A.    It might have been there.
12   Q.    It might have been where?
13   A.    Might have been leaning up on the
14 roof.
15   Q.    Was it leaning up on the roof?
16   A.    I don't recall.
17   Q.    It wasn't your ladder?
18   A.    No.
19   Q.    You used somebody else's ladder to
20 go up there, right?
21   A.    Yes.
22   Q.    Did you ask permission?
23   A.    No.
24   Q.    You took somebody else's ladder and

5 7

1  you're not even sure whose and went up on the
2  roof?
3    A.    I didn't take anything, it was
4  there.
5    Q.    You just told me you don't remember
6  that?
7    A.    The ladder was there.
8    Q.    There was a ladder on the site, you
9  don't recall whether it was on the ground or up
10 on the roof, where it was?
11   A.    You're right, yeah.
12   Q.    So you took the ladder that belonged
13 to somebody else and utilized that to get up on
14 the roof without telling anybody you were doing
15 so, correct?
16   A.    Yes.
17   Q.    You were not scheduled to be back up
18 on that roof based upon what you told Mr. Boland
19 until September 10th, correct?
20   A.    I don't know if that's accurate or
21 not.  I don't recall actually -- I don't know if
22 I told him I had to measure for the drip edge or
23 not.  That's something that needed to be done for
24 the job, a requirement.

5 8

1    Q.    What parts of your body do you claim
2  you injured as a result of this incident?
3    A.    My right foot.
4    Q.    Did you have worker's compensation
5  insurance?
6    A.    No.
7    Q.    Why not?
8    A.    I could not afford it.
9    Q.    Did Seamless Metal Roofing provide
10 you with workman's compensation insurance when
11 you worked for them?
12   A.    No.  Actually, I did have workman's
13 comp for anybody who worked for me but it did not
14 cover myself.
15   Q.    The people you paid under the table?
16   A.    Yeah.
17   Q.    How did you have workman's
18 compensation for --
19   A.    It's a requirement.  I can't explain
20 it.  That is paperwork stuff and I only went to
21 11th grade.
22   Q.    Do you have the paperwork stuff for
23 it?
24   A.    I believe I can get it.

5 9

1    Q.    Get that and give it to your counsel
2  and counsel and I will discus whether to produce
3  it.
4    What was the injury that you claim
5  you sustained to your right foot?
6    A.    I broke three bones.  If these were
7  the toes, they were this one, this one, and this
8  one, right underneath the knuckles.  They had to
9  take pins and go through the knuckles into the
10 bone to straighten them out.  Of course a couple
11 of bruises on my arms because I put them out to
12 catch myself.  I cut my nose.
13   Q.    That it?
14   A.    Yes.
15   Q.    Had you ever sustained any injury to
16 your right foot at any time prior to September of
17 2001?
18   A.    Not to my knowledge.  I might have
19 twisted it when I was a kid.
20   Q.    Had you ever sustained an injury to
21 your left foot at any time prior to September
22 2001?
23   A.    Same thing.  I know I twisted my
24 ankle.  I don't remember which one.

6 0

1    Q.    Had you ever been out of work for
2 any period of time in the five years prior to
3 this incident for any injury or ailment other
4 than the common cold or things like that?
5    A.    None at all.
6    Q.    How long do you claim you were out
7 of work as a result of this incident?
8    A.    Two months.
9    Q.    Two months?
10    A.    Yes.
11    Q.    When you went back to work, did you
12 go back to work for yourself?
13    A.    Yes, same working conditions, yes.
14    Q.    And did you have jobs lined up when
15 you went back to work from your dad?
16    A.    Yes.
17    Q.    Do you have any recollection as to
18 what job you went to work on, the first job?
19    A.    None at all. I believe there was
20 documentation of the checks that I got from them.
21 I don't know if you got them or not.
22    Q.    There's documentation of checks that
23 you got from what?
24    A.    The company. I believe Weitstein

61

1 and Weitstein had me get those, the jobs that I
2 did after, the job names and the checks.
3       MS. PELLETIER: I don't believe we
4    have those. Do you recall seeing those?
5       MR. CVEJANOVICH: I'll track them
6    down the best I can, yes. As we sit here
7    today, I don't recall seeing any checks.
8    Q.    (By Ms. Pelletier) What was the
9 purpose of Mr. Weitstein having those checks?
10    A.    I'm not sure.
11    Q.    Did you get paid the same way as you
12 had before?
13    A.    Yes.
14    Q.    Did you get paid the same amount as
15 you had before?
16    A.    No.
17    Q.    Why not?
18    A.    I worked less hours. I only worked
19 six hours a day.
20    Q.    Were you provided with some
21 restriction by some health care professional?
22    A.    No, it was just too painful walking
23 on the roof with my injury.
24    Q.    For how long did you only work six

62

1 hours a day?
2    A.    For about eight months.
3    Q.    Did you ever apply for any kind of
4 disability?
5    A.    No.
6    Q.    Did you claim that you were
7 disabled?
8    A.    Do I claim, no.
9    Q.    After this eight-month period, did
10 you then go back to full time?
11    A.    Yes.
12    Q.    Did you do the same work?
13    A.    No, I only think I worked for not
14 too long after that and I went back to siding.
15    Q.    When you went back to siding, did
16 you go back to siding as yourself as a contractor
17 for Seamless Metal or as an employee of Seamless
18 Metal?
19    A.    I subcontracted. I'm not sure. I
20 can't remember. I think it was a year or two or
21 something. I'm not even positive.
22    Q.    Why did you make a change to your
23 present job?
24    A.    Because of the injury of my foot.

63

1 It was just too much walking on an angle, the
2 angle of a roof was too much for my foot.
3    Q.    You didn't have to walk on an angle
4 doing siding work, right?
5    A.    Basically you're flat ground on a
6 plank, the plank is flat like a sidewalk.
7    Q.    Why did you leave that siding job to
8 go to the window job?
9    A.    The terrain around the job, the same
10 thing. I have to work for a living. I have to
11 make a living.
12    Q.    You don't have issues with terrain
13 when you do window installation?
14    A.    Yes, sometimes.
15    Q.    What were you making when you were
16 working in the siding as opposed to the roofing?
17    A.    I got paid by the square on that
18 too. I'm not sure. I can get my W2 forms, my
19 1099 forms to show that.
20    Q.    Were there activities that you
21 participated in prior to this incident that you
22 were limited in participating in or refrained
23 from participating in as a result of the
24 incident?

64

1    A.    Yes, I used to enjoy hunting.  I
2 don't go hunting anymore because of the terrain.
3    Q.    What about the terrain?
4    A.    It's up and down.  When you walk
5 into the woods, it's different elevations.
6 You're walking up and over trees.  You've got
7 holes, rocks.
8    Q.    What about that?
9    A.    What about that, the angle of my
10 foot moving.  It causes pain after awhile.
11    Q.    Have you been hunting at all since
12 the incident?
13    A.    No.
14    Q.    When was the last time you had been
15 hunting prior to the incident?
16    A.    Prior to the incident, yeah, about a
17 year.
18    Q.    How often would you go hunting?
19    A.    I don't know, four, six times a
20 season.  Sometimes I would take a trip up to
21 Vermont.
22    Q.    It's your testimony you have not
23 been at all since this incident?
24    A.    No, I have not required a license

65

1    A.    That was over at UConn, Dr. Aaron or
2 something.  I don't recall the exact name.  I'm
3 not good with names.
4    Q.    Why did you go to see the doctor in
5 2005?
6    A.    He gave me a cortisone shot to help
7 with the pain in my foot.  They suggested if that
8 doesn't help, I can get an operation.  I don't
9 know if I want to go through that again.  You
10 have to take time off work and then if it makes
11 it worse, you know, it's kind of scary.
12    Q.    How many shots do you claim that you
13 had?
14    A.    I had two.  The first one worked
15 really well and the second one lasted like a
16 month and that was it.  I believe the first one
17 lasted for about six months.
18        MS. PELLETIER:  Counsel, I think,
19    and help me out if I am wrong, Dan, the last
20    note that we have --
21        MR. CVEJANOVICH:  I'm sorry?
22        MS. PELLETIER:  The last note I have
23    is from 2004, early April 2004, May of May 5,
24    2004.

67

1 since then.
2    Q.    You haven't what?
3    A.    Required a hunting license since
4 then.
5    Q.    You have not required one?
6    A.    Exactly, I didn't go hunting.  I
7 didn't need a license.
8    Q.    Any other activities that you
9 refrained from participating in or limited your
10 participation in that you claim is a result of
11 the incident?
12    A.    Yes, I am not as active with my
13 children playing sports and such things.
14    Q.    Anything else?
15    A.    Bicycling.
16    Q.    Anything else?
17    A.    No.
18    Q.    When was the last time you saw any
19 health care professional in connection with the
20 injury you claim you sustained in September 2001?
21    A.    Last year sometime.
22    Q.    2005?
23    A.    Yes.
24    Q.    Who was it?

66

1        THE WITNESS:  That might as well
2    been the last one.  I can double check with
3    the doctor's office.
4        MR. CVEJANOVICH:  Off the record.
5        (Off record discussion)
6    Q.    (By Ms. Pelletier)  Has any health
7 care professional given you any documentation to
8 indicate that your activities should be
9 restricted in any way as a result of this
10 incident?
11    A.    No.
12    Q.    Do you have any appointments
13 scheduled with any health care professional in
14 the future in connection with any injury that you
15 sustained in this incident?
16    A.    I have an option, but I don't think
17 I'll take it.
18    Q.    Presently you have no appointments
19 scheduled?
20    A.    Yes.
21    Q.    Have you sustained any injuries
22 since September 2001?
23    A.    No.
24    Q.    Have you ever sustained any other

69

1  work-related injuries?
2      A.      No.
3      Q.      Have you ever sustained any other
4  falls as an adult?
5      A.      Yes, I think I was 17 or 18, a guy
6  kicked a staging out and I fell.
7      Q.      How far?
8      A.      Ten feet.
9      Q.      But you didn't sustain any injuries?
10     A.      I got a scrape on my stomach, it was
11 nothing.
12     Q.      Have you ever been involved in any
13 other litigation?
14     A.      No.
15     Q.      Have you ever been in a motor
16 vehicle accident?
17     A.      Yes.
18     Q.      When?
19     A.      A little fender bender.  I think I
20 was 17 or 18 and the other one I was 22, just a
21 bumper tap.
22     Q.      Have you ever been a defendant in
23 any litigation?
24     A.      No.

69

1      Q.      Have you ever been convicted of a
2  felony or a misdemeanor?
3      A.      Yes.
4      Q.      When?
5      A.      I think I was 23.  It was a drug
6  charge.
7      Q.      What state?
8      A.      Connecticut.
9      Q.      Was it a state charge or a federal
10 charge?
11     A.      I think it was federal.
12     Q.      What was the charge?
13     A.      Attempt to buy crack cocaine.
14     Q.      You were tried and convicted?
15     A.      Tried, I guess so, yeah.  I went to
16 court and I had to pay a fine.
17     Q.      Any other convictions?
18     A.      No.   Well, I got a DUI a year and a
19 half ago actually.
20     Q.      A DUI a year and a half ago?
21     A.      A year and a half, two years.
22     Q.      Were you convicted of that?
23     A.      Yes.
24     Q.      Where was that?

70

1      A.      That was Bristol, Connecticut.
2      Q.      What were the circumstances of that
3  incident?
4      A.      Failure to signal.
5      Q.      You didn't signal and got pulled
6  over?
7      A.      Yes.
8      Q.      A town or a state?
9      A.      Town officer.
10     Q.      As a result of that you were charged
11 and convicted of operating under the influence?
12     A.      Yes.
13     Q.      Did you have to serve any time?
14     A.      No time.  I had to go through a DUI
15 course, which was very educational.
16     Q.      Any other convictions?
17     A.      Not to my knowledge, no.
18             MS. PELLETIER:  I don't have any
19     further questions at the moment.  I'm going
20     to suspend instead of closing the deposition
21     pending the receipt of the documents.
22             Mr. Rider, I'm sure, has some
23     questions for you.
24

71

1      CROSS EXAMINATION BY MR. RIDER:
2      Q.      Just a few Mr. Dade.  My name is
3  Daniel Rider.  I represent Stuart and Mary Rose
4  Jones, the homeowners in the suit.  I just want
5  to clarify your status.  When you took on the job
6  at the Jones', you were an independent
7  contractor?
8      A.      Subcontractor.
9      Q.      Not an employee of Seamless?
10     A.      No, but I subcontract basically just
11 them at the time.
12     Q.      What was the purpose of changing
13 your status periodically with status from
14 employee to subcontractor?
15     A.      When I was 17, I started off as a
16 subcontractor.  I was working by the hour and
17 then I quit school.  My father said, you know, go
18 to work or go to school one or the other, make a
19 choice.  So I chose to go to work.  And then I
20 did work by the hour and I did very well and I
21 did a nice job.  The guy said, we'll offer you
22 piece work.  So then I started doing the piece
23 work as a sub.
24     Q.      That's when you changed from an

72

1 employee to an independent contractor?
2    A.    Right, then they switched over to
3 the metal company and then I went back by the
4 hour.  Then I worked by the hour for four or five
5 maybe eight years, I'm not sure.  Then I quit and
6 then went with siding and then I went back
7 because my father became a salesman.  I went back
8 to help him out and sub again.  The company was
9 in a hole.  I was doing some jobs cheap.  Things
10 were starting to go good when I fell through the
11 roof and then it changed everything again.
12    Q.    So the reason for being a -- strike
13 that.
14          Is there a distinction in your mind
15 between a subcontractor an independent
16 contractor?
17    A.    A contractor you need a license.
18    Q.    An independent or subcontractor?
19    A.    Independent you need a license.
20    Q.    Subcontractor you don't?
21    A.    No, you go through the license of
22 the contractor.
23    Q.    So when you went from employee to
24 subcontractor, was there a benefit to you?

7 3

1 to be before you got to the project site?
2    A.    Yes, basically.  My father explained
3 to me there was a barn, we're going to do that
4 first and then the main house.  He said there are
5 a couple of skylights going in and Tom would tell
6 me where they were going.
7    Q.    So you went up there knowing there
8 were going to be skylights but not knowing where
9 they were, is that what you're saying?
10    A.    Right.
11    Q.    This roofing, this metal roofing,
12 it's put on how -- strike that.
13          It's not one piece, one sheet of
14 metal on the roof cut to fit the roof?
15    A.    No, it's in pieces like siding.
16 It's exactly like siding, except going from
17 bottom to top you go left to right or right to
18 left.
19    Q.    So the panels of the siding run
20 vertically or roofing run vertically as opposed
21 to horizontal?
22    A.    Yes.
23    Q.    How wide were these panels?
24    A.    I believe on that house they were 16

7 5

1    A.    Yeah, I was able to make more money.
2 The faster I went, the more I did, the more I'd
3 make.
4    Q.    When was the last time you had been
5 an employee of Seamless before this incident?
6    A.    I'm not sure, maybe '96, '97.
7    Q.    So far --
8    A.    Somewhere around there.
9    Q.    Five or six years prior to this
10 incident you were a subcontractor?
11    A.    Yes, if I went back to get my W2's,
12 I could clarify the exact date.
13    Q.    So you were a subcontractor working
14 under Boland's license?
15    A.    Under Seamless Metal Roofing's
16 license.
17    Q.    And Boland hired Seamless --
18    A.    Yes.
19    Q.    -- to put on a roof?
20    A.    Yes.
21    Q.    Seamless sent you out to do the
22 work?
23    A.    Yes.
24    Q.    Did you know what the work was going

7 4

1 inches, but that machine could go 8 to 12 or 16
2 to 20.
3    Q.    The machine you're talking about,
4 what is that?
5    A.    It's a seamless metal machine.  It
6 comes in a big roll, like a gutter machine.  You
7 run it through and it forms it.  You cut the
8 length, whatever you want, 20 feet, 30 feet, 100
9 feet.
10    Q.    When you put on a roof, is it
11 important to know where skylights are going to be
12 before you cut the panels for the roof?
13    A.    The skylights have to be installed.
14 They have to be there.
15    Q.    When you are cutting the panels for
16 the roof, you know how long to cut them?
17    A.    Yes, like if I was cutting out the
18 windows on the side of the house, the siding,
19 same effect.
20    Q.    The purpose of going up on the roof
21 on the day you fell through, the purpose of going
22 up with Mr. Boland was what again?
23    A.    I went up to discus the main roof
24 with him.  You know, he was going to tell me

7 6

1 about the skylights and any other questions he
2 had.
3        Q.      When you say he was going to discuss
4 with you the skylight, what were you anticipating
5 he was going to tell you about the skylights?
6        A.      Not too much.  Basically it was not
7 the skylights really, it was the job in general,
8 if he had any questions.
9        Q.      It was important to you were the
10 skylights where, was it not, where they were cut
11 out?
12        A.      It doesn't matter to me until when
13 they're in.  When they're in, I will deal with
14 it.
15        Q.      Placement of a skylight on a roof
16 from left to right is not important to you as to
17 how easy it is to cut the panels?
18        A.      Yes, yes, some time you can make
19 sure to make it easier.  There are details like
20 that, yes.
21        Q.      There are railings that abut the
22 skylight, did you discuss that with Boland while
23 you were on the roof?
24        A.      No, he just told me he didn't put

7 7

1 the skylights in yet.
2        Q.      Which was obvious?
3        A.      Yes, because I didn't see them.  He
4 didn't tell me they were cut off.  He pointed.  I
5 got the skylights going over here.  I thought it
6 was the big flat part of the roof.
7        Q.      When you were up on the roof with
8 Boland, where exactly were you?
9        A.      I believe we were about five feet
10 away from the skylight that I fell through.  I
11 can draw you a picture or if you have a picture,
12 I can show you.
13        Q.      I'll show you a photograph.  I think
14 it was Exhibit 1 in Mary Rose Jones' deposition.
15 It's actually one piece of paper with copies of
16 three photographs.  Why don't you take a look at
17 that and tell me if those photographs show the
18 roof?
19        A.      Sure.  We were standing right here
20 and he was pointing over here.  So I thought the
21 skylights were going on this side, this backside
22 here.
23        Q.      Why don't you put an X where you
24 were standing?

7 8

1        A.      Right about here, right next to this
2 door.
3        Q.      Put a circle around it so it's
4 standing out.
5        A.      He pointed across this way.  I
6 thought the skylights were the other side, the
7 flat section.  I thought this section was where
8 he was pointing.
9        MR. CVEJANOVICH:  Can we mark where
10    he pointed to?
11        MR. RIDER:  You can ask.  I'm not
12    going to.
13        Q.      (By Mr. Rider)  You were standing
14 with Boland when he pointed out where the
15 skylights were going to be?
16        A.      Yes, it's on the flat portion of the
17 roof, which looks like it's the porch of the
18 house.
19        Q.      How did you get up from that spot,
20 did you climb a ladder from the front?
21        A.      I think it was the backside over
22 here.  I came down around this way.
23        Q.      So the two of you got on the roof
24 from the back of the house, walked to the peak of

7 9

1 the house and then down to the flat of the roof?
2        A.      He was actually all ready up there.
3        Q.      You distinctly remember going up
4 from the back of the house?
5        A.      Yes.  I believe that was the same
6 ladder I used later on in the afternoon.
7        Q.      You thought the skylights were going
8 on the back of the house as opposed to the front
9 of the peak of the house?
10        A.      Yes.
11        MR. RIDER:  Could you mark this,
12    please.
13        (Exhibit 1, marked)
14        Q.      (By Mr. Rider)  Do you recall your
15 route, the route you took walking from the back
16 of the house over the peak of the roof and down
17 to where you had the conversation with Boland?
18        A.      No, I don't.  I'm not sure I went
19 across the front or the back.  Actually, yes, I
20 did go across the front.  Yeah, I walked across
21 the front.  There was a big ditch over here I had
22 to go over.  That is how I remember.
23        Q.      I'm sorry.  Bad question.  I assume
24 you climbed the ladder to get on the roof?

8 0

1    A.    Yes.

2    Q.    When you climbed, do you remember
3 the course you took? Just trace it out with your
4 finger if you would.

5    A.    I came this way on the ground, came
6 to the backside of the ladder, came around like
7 this.

8    Q.    So you did or did not cross the peak
9 of the roof to get to this spot?

10    A.    No, I didn't. Can I borrow this?

11    Q.    I don't want you to --

12    A.    I was not going to draw. I was
13 going to use a finger. See this peek, this is
14 the side I came up. I came down this way and
15 across the way to Boland.

16    Q.    You did not cross over the peak
17 where the skylights were, this line?

18    A.    No.

19    Q.    You've put an X on the location
20 where you had the conversation with Boland on the
21 middle photograph on Exhibit 2?

22    A.    Yes.

23    Q.    Look at the top exhibit,
24 photograph, that shows the same roof at a

8 1

1 different angle?

2    A.    Yes, we would be right about here.
3 So I came down across here and went across this
4 way.

5    Q.    So as you're facing the house, you
6 came down the front roof in an area to the right
7 of the triangular peak we see?

8    A.    Right here, exactly.

9    Q.    And you had this conversation --
10 still looking at the top photograph, you had the
11 conversation to the left?

12    A.    Right about here.

13    Q.    When Boland was telling you where
14 the skylights were going to be, he pointed where?

15    A.    In this direction here. He didn't
16 point down. That's why it threw me off because
17 he pointed like up over here, kind of had his arm
18 up.

19    Q.    But he pointed to an area to the
20 left of the --

21    A.    Straight across.

22    Q.    Let me finish so we get a clear
23 record. He pointed to an area to the left of the
24 peak, the white peak in the photograph?

8 2

1    A.    Yes.

2    Q.    Which is the general area where the
3 skylights actually are?

4    A.    Correct.

5    Q.    At that point you didn't ask him or
6 you weren't concerned exactly where the skylights
7 were going to be?

8    A.    No, I told him he needed to install
9 them and I'd deal with it at that time.

10    Q.    Before you got to the project, were
11 you aware there were going to be skylights?

12    A.    Yes, my father told me there were
13 going to be skylights, yes.

14    Q.    And your first day on site was
15 September 6th, the day you fell?

16    A.    Yes.

17    Q.    Before September 6th had you talked
18 to my clients, the Jones'?

19    A.    No.

20    Q.    Do you know if anybody at Seamless
21 had talked to the Jones'?

22    A.    I don't know.

23    Q.    Moffit on this project, the Jones'
24 project, he was your partner?

8 3

1    A.    Yes, we teamed up.

2    Q.    When you use the word partner, do
3 you mean in a legal sense or he was your equal?

4    A.    Legal sense --

5    MR. CVEJANOVICH:  Objection, calling
6    for a legal conclusion.

7    THE WITNESS:  We joined together.
8    He's a sub, the sub we joined together and
9    split the money.

10    Q.    (By Mr. Rider)  You were both
11 subcontractors for Seamless at that time?

12    A.    Yes.

13    Q.    Who did you report to at Seamless?

14    A.    I reported to my father, which was
15 the salesman.

16    Q.    So it was your father who sent both
17 you and Moffit to this job site?

18    A.    Yes.

19    Q.    Did your father split up the work
20 that you and Moffit were to do?

21    A.    No, he let us delegate that.

22    Q.    His understanding was you two were
23 equal, you two figure out who does what at the
24 Jones' site?

8 4

1    A.    Right.

2    Q.    When you first got on the site on
3 the 6th, what was the status of the barn that was
4 to be roofed, how far along was that?

5    A.    That was an existing building.

6    Q.    But that was to be roofed also?

7    A.    We started off with that, yes.

8    Q.    Who did that -- when you first got
9 to the site?

10    A.    We all worked together and did it.

11    Q.    So when you first got to the site on
12 September 6th, the barn had not been done?

13    A.    Right, exactly.

14    Q.    You did the barn on one day on the
15 6th?

16    A.    No, we finished it the following
17 day. We started it, got half done, and finished
18 the other half.

19    Q.    When you say we, you and your crew
20 and Moffit and his crew?

21    A.    Right.

22    Q.    Were there any skylights on the
23 barn?

24    A.    No.

85

1    Q.    Why did he not join in the
2 conversation?

3    A.    He was finishing the barn with the
4 other guys.

5    Q.    Was it your understanding at that
6 point you were going to do the house?

7    A.    We were going to do it together on
8 the 7th.

9    Q.    Did you talk to the Jones'?

10    A.    I might have. I know I spoke to her
11 when I fell through the hole.

12    Q.    Was there a permit necessary for
13 this work?

14    A.    Yes.

15    Q.    Who pulled the permit, do you know?

16    A.    I don't know.

17    Q.    Did you ever see it?

18    A.    No.

19    Q.    Did you ever see the skylights on
20 the job?

21    A.    No.

22    Q.    Who purchased the skylights?

23    A.    I don't know.

24    Q.    But Seamless didn't provide --

87

1    Q.    Did you see Boland on this site on
2 the 6th when you were there?

3    A.    I believe so, yes.

4    Q.    Was the tarpaper on the roof on the
5 6th, did you notice?

6    A.    I didn't really pay attention that
7 well, to give you an honest answer. I'm not
8 sure.

9    Q.    Did Moffit ever discuss with Boland
10 the installation of the skylights that you're
11 aware of?

12    A.    I don't think so. He might have
13 after the fact of the fall. I wasn't there.

14    Q.    On the 6th what was your
15 understanding of how you and Moffit were to split
16 up the work on the main house?

17    A.    We kind of worked together. You
18 know what I mean, we worked together, all
19 together as a team.

20    Q.    Was Moffit with you when you
21 discussed the roof -- the house roof on the 7th
22 with Boland?

23    A.    No, he was there but not on the
24 roof.

86

1    A.    No, that was Tom Boland's end.

2    Q.    I assume, because your first day on
3 the site was the 6th, no other Seamless employee
4 was on the -- employee or subcontractor was on
5 the site before September 6th, is that accurate?

6    A.    Not to my knowledge. My father had
7 to be. He had to go up there to measure it.

8    Q.    On the 7th what time do you think
9 you and Boland were on the roof?

10    A.    Approximately 10 o'clock. I know it
11 was in the morning sometime.

12    Q.    What was Boland's job, what was he
13 doing?

14    A.    He built the addition onto the
15 house, framed it, tarpapered it. Our job was
16 strictly the metal.

17    Q.    While you were on the roof or at any
18 time on the 6th or 7th, did you have a discussion
19 with Boland about flashing of the skylights?

20    A.    Yes, on the 7th.

21    Q.    What was that conversation?

22    A.    He wanted to know if we needed to
23 get the kits for it. I told him he didn't need
24 to because we make our own flashings.

88

1    Q.    Now flashing is what?

2    A.    A flashing is like an L-bent piece.
3  I believe it goes up four inches and then goes
4  out six inches.

5    Q.    Is there any material -- strike
6  that.

7         Describe the process of putting in a
8  skylight, if you can?

9    A.    The skylight is there, we take an
10 L-bent flashing and put it on the bottom, flap
11 the sides up, we put the sides up, flat the top,
12 put the top piece on and then flap that down
13 because, you know, water runs down, so it's all
14 overlapped in the proper manner.

15   Q.    Is there any, for a lack of a better
16 term, gasket needed between the skylight and the
17 roof?

18   A.    We use a G-seal.

19   Q.    Between the skylight and roof?

20   A.    They have these little brackets,
21 they're screwed.

22   Q.    Is there any rubber or similar
23 material necessary to seal this skylight to the
24 roof prior to applying the roofing?
                                            8 9

---

1  me.

2    Q.    Can you describe Mike Moffit?

3    A.    What he looks like?

4    Q.    How old is he?

5    A.    A couple years older than me, 41,
6  42, about 5'10, skinny.

7    Q.    Caucasian?

8    A.    Yes.

9    Q.    How tall are you?

10   A.    I'm 6'2 and a quarter.

11   Q.    When you went up on the roof a
12 second time on the 7th, where was Mike Moffit?

13   A.    He was with me.  He was right behind
14 me when I went through that hole.

15   Q.    He saw you go through the hole?

16   A.    Yes.

17   Q.    Do you know if Mike Moffit had been
18 on the roof prior to your falling through it?

19   A.    He might have.  I'm not sure.

20   Q.    You said you did see the skylights
21 on the premises at some point?

22   A.    No.

23   Q.    Never did?

24   A.    No, I never did.
                                            9 1

---

1    A.    No, just the rubber that is already
2  on the skylight that comes when you buy it.

3    Q.    What was the kit that you say Boland
4  referred to?

5    A.    Yeah, that's a kit that comes for a
6  shingled roof.  Instead of a long piece going up
7  the side, they have the step flashes that goes up
8  individual shingles.  They are like nine inches
9  long.

10   Q.    So a part to the skylight kit or the
11 actual skylight glass with a wood or plastic
12 frame and flashing?

13   A.    Yes.

14   Q.    No other parts?

15   A.    No.

16   Q.    Are you aware if -- strike that.

17         After you fell, I think you stated,
18 that Mrs. Jones gave you a rag or bandage?

19   A.    Rag, a kitchen towel, a towel.

20   Q.    Who else do you recall being in the
21 room other than the emergency people that
22 arrived?

23   A.    The crew that was working there with
24 me, Mike Moffit, his guys, the guys working with
                                            9 0

---

1         MR. RIDER:  That's all I have.
2    Thank you.

3

4    REDIRECT EXAMINATION BY MS. PELLETIER:

5    Q.    You testified that you think you're
6  operating under Seamless Metal's license because
7  they have a license and they hired you as a
8  subcontractor?

9    A.    That's my understanding.  I'm not
10 sure.

11   Q.    Is it your understanding that you
12 need a license to install a metal roof?

13   A.    No.

14   Q.    What are you talking about?

15   A.    A contractor's license.

16   Q.    Other than the hunting license,
17 which you don't hold any longer, and a driver's
18 license, do you hold any other licenses?

19   A.    No.

20   Q.    Is your driver's license valid at
21 the moment?

22   A.    Oh, yes.

23   Q.    Did you have your driver's license
24 suspended as a result of the OUI?
                                            9 2

24

```
 1        A.     Yes.
 2        Q.     What period of time?
 3        A.     Four months.
 4        Q.     Did you drive during that period of
 5 time?
 6        A.     I required a permit during the day.
 7 So I was legal to drive, I think it was, from
 8 seven -- six to seven Monday through Saturday.
 9             MS. PELLETIER:  I don't have
10     anything further subject to the earlier
11     comments.
12             (Exhibit 2, marked)
13             (Witness excused)
14             (Deposition suspended)
15
16
17
18
19
20
21
22
23
24
```

93

```
 1 COMMONWEALTH OF MASSACHUSETTS
   Hampden, ss.
 2
 3     I, MYREL J. WILLIAMS, a Notary Public in and
   for the Commonwealth of Massachusetts, do certify
 4 that there came before me on the 20th day of
   January, 2006, at the LAW OFFICES OF ROBINSON
 5 DONOVAN, P.C., 1500 Main Street, Springfield,
   Massachusetts, the following named person, to
 6 wit:  ROBERT DADE, who was by me duly sworn to
   testify to the truth and nothing but the truth as
 7 to his knowledge touching and concerning the
   matters in controversy in this cause; that he was
 8 thereupon examined upon his oath and said
   examination reduced to writing by me; and that
 9 the statement is a true record of the testimony
   given by the witness, to the best of my knowledge
10 and ability.
11
12     I further certify that I am not a relative or
   employee of counsel/attorney for any of the
13 parties, nor a relative or employee of such
   parties, nor am I financially interested in the
   outcome of the action.
14
15     WITNESS MY HAND this 14th day of February,
16 2006.
17
18
19             Myrel J. Williams
20             Notary Public
21
22     My Commission expires:
23     July 10, 2009
24
```

95

```
 1          SIGNATURE/ERRATA SHEET
 2     I have read the foregoing, and it is a true
 3 transcript of the testimony given by me at the
 4 taking of the subject deposition with the
 5 following corrections/changes, if any:
 6
 7  _____        _____
 8  Date                        Robert Dade
 9 PAGE      LINE      CHANGE
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 Case Name:
20 Date Take:  January 20, 2006
21 mjw
22
23
24
```

94