**EXHIBIT**

K

**Page 1**

UNITED STATES DISTRICT COURT
District of Massachusetts

No. 04-30172-MAP

ROBERT DADE
        Plaintiff
vs.

BOLAND BUILDERS, INC., THOMAS M.
BOLAND, STUART JONES and
MARY ROSE JONES
        Defendants

            DEPOSITION OF:  ROBERT E. DADE, taken
before ROXANNE C. COSTIGAN, Notary Public
Stenographer, pursuant to Rule 30 of the
Massachusetts Rules of Civil Procedure, at the
offices of ROBINSON DONOVAN, P.C., 1500 Main Street,
Suite 1600, Springfield, Massachusetts on March 20,
2006.

APPEARANCES:  (See Page 2)

            Roxanne C. Costigan
            Registered Merit Reporter

**Page 3**

            I N D E X

WITNESS       DIRECT   CROSS   REDIRECT   RECROSS
Robert Dade, Sr.   4      66

                   77      81

EXHIBITS                          PAGE:
Exhibit 1-4, pre-marked....................   4
Exhibit 5, proposal...........................  23
Exhibit 6, computer printout...................  56
Exhibit 7, computer printout...................  58
Exhibit 8, check stubs.........................  90
Exhibit 9, check stubs.........................  80

**Page 2**

APPEARANCES:

FOR THE DEFENDANT:

JOHN W. WHITE LAW OFFICE
1500 Main Street
Springfield, MA
    BY:  DANIEL R. RIDER, ESQ.

FOR THE PLAINTIFF:

O'CONNELL, FLAHERTY & ATTMORE
1350 Main Street
Springfield, MA
    BY:  JOHN A. CVEJANOVICH, ESQ.

FOR THE DEFENDANT:

ROBINSON DONOVAN, P.C.
1500 Main Street
Springfield, MA  01115
    BY:  NANCY FRANKEL PELLETIER, ESQ.

**Page 4**

            STIPULATIONS

        It is agreed by and between the parties
that all objections, except objections as to the form
of the questions, and all motions to strike
unresponsive answers are reserved and may be raised
at the time of trial for the first time.

        It is further agreed by and between the
parties that the sealing of the original deposition
transcript and notification to all parties of the
receipt of the original deposition transcript is
hereby waived.

            (Exhibits 1-4, marked)

        ROBERT E. DADE, Deponent, having been
satisfactorily identified by the production of his
driver's license and having been first duly sworn by
the Notary Public, deposes and says as follows:

        DIRECT EXAMINATION BY MS. PELLETIER:
        Q.    Can you state your full name and present
residential address, please?
        A.    **Robert Ernest Dade, 51 Laurel Drive,**
**Thomaston, Connecticut.**

7

```
1    Q.    Have you ever had your deposition taken
2    before?
3    A.    No.
     Q.    One of the very important rules in a
5    deposition is for you to wait until I finish a
6    question before you begin speaking because the
7    stenographer can't take down two people speaking at
8    the same time.  Do you understand that?
9    A.    Yes, I do.
10   Q.    Do you have a son whose name is also
11   Robert Dade?
12   A.    Yeah, Robert Joseph Dade.
13   Q.    Who is Robert M. Dade?
14   A.    Nobody I know.  It's not M.  It's J.  His
15   middle initial is J.  I don't know where M --
16   Q.    Can you tell me what you did in order to
17   prepare for this deposition today?
18   A.    Well, I got these records from my
19   partner.  This is the printouts from my accountant
20   who is Riccarddelli.  The reason we have that is
21   these checks are the only existing proof I have of
22   wages because the computer crashed.  So, I don't have
23   any records of this time period other than these
24   checks.
```

1    Q.    Did you talk to your son?
2    A.    No.
3    Q.    You didn't talk to him at all?
4    A.    Well, I called him.  I thought he was
5    coming here today.  I mean, he said no, he wasn't
6    coming here today.  I made that call this morning
7    but -- because I was trying to figure out how to get
8    here.
9    Q.    Where are you presently employed, sir?
10   A.    Seamless Metal Roofing, LLC.  It's a --
11   Q.    Seamless Metal Roofing?
12   A.    What happened is --
13   Q.    Hang on a minute.  Seamless Metal
14   Roofing, LLC?
15   A.    Yes.  20 Walnut Hill Road, Thomaston,
16   Connecticut.
17   Q.    When was Seamless Metal Roofing, LLC
18   created?
19   A.    2001.
20   Q.    What month?
21   A.    I'm not sure.  I'd have to find out.
22   Q.    Do you know when your son's accident was?
23   A.    I believe it was September, 2001.
24   Q.    As of the date of your son's accident,

6

1    Q.    Did you have any conversations with
2    anyone?
3    A.    Conversations?
4    Q.    Did you talk to anyone?
5    A.    Just the attorney.
6    Q.    Okay.
7    A.    About what?  What do you mean?
8    Q.    What did you say and what did he say?
9    A.    Oh, he just asked me to get these
10   records, that's all, and come here for a deposition,
11   that's all.
12   Q.    Did you talk to your -- who is your
13   partner?
14   A.    Janet Couch.
15   Q.    Spell the last name.
16   A.    C O U C H.
17   Q.    Did you talk to her?
18   A.    Oh, yeah.  Well, that's how I got these
19   records.  Yeah.
20   Q.    What else did you talk to her about?
21   A.    Just that I needed these records that the
22   attorney requested.
23   Q.    Did you talk to your son?
24   A.    What?

8

1    did Seamless Metal Roofing, LLC exist?
2    A.    I don't think so.  I'm not sure of the
3    date.  I thought it did.  See, I was under the
4    impression that this was -- not that I did, but it
5    was shortly after that.  My partner told me that, no,
6    this was the company at the time and we changed it.
7    Shortly after that, we incorporated, I guess, you
8    know.  See, this is the old company under her husband
9    and her, right, and Seamless Metals, and we
10   incorporated.  We were partners.  I'd have to get
11   that information from my accountant.  I really
12   couldn't tell you.
13   Q.    When did you first have any kind of a
14   relationship with anybody with the name Seamless
15   Metals?
16   A.    Well, back when Doug was running the
17   business, probably fifteen, maybe eighteen years ago.
18   I don't know.
19   Q.    Doug would be Janet's husband?
20   A.    Right.  He's now deceased, though.
21   Q.    Okay.  When you first had any form of a
22   relationship with Seamless Metals, what form did the
23   entity take, was it a corporation, was it a
24   partnership, what was it?

9

```
1      A.     I don't really know.  I just work for
2   them, you know.
3      Q.     What was your job?
4      A.     I ran a crew, you know.  I subcontracted
5   work from them really.
6      Q.     You ran a crew for them?
7      A.     Yeah.  Yeah, as a subcontractor.
8      Q.     So, you were not an employee of theirs?
9      A.     I was a subcontractor.
10     Q.     You were not an employee?  Do you know
11  what an employee is as opposed to --
12     A.     Yes, I know.  That's why I'm telling you
13  I was a subcontractor.
14     Q.     So, you were a subcontractor, that was
15  the relationship that you had with Seamless Metals?
16     A.     Seamless Metals, right.
17     Q.     What were you subcontracted to do?
18     A.     Siding and roofing, mostly siding.
19     Q.     Were you ever actually employed by
20  Seamless Metal Roofing in whatever form it took --
21     A.     No.
22     Q.     You need to wait until I finish the
23  question, sir.
24     A.     Sorry.
```

11

```
1      A.     A 1099.
2      Q.     You then testified that your son at some
3   point was an employee of Seamless?
4      A.     Well, no.  Sorry.
5      Q.     He was never an employee of Seamless?
6      A.     Never an employee.
7      Q.     Does Seamless have any employees?
8      A.     What's that?
9      Q.     Did Seamless have any employees?
10     A.     No.
11     Q.     They never had any employees?
12     A.     No.  They always used subcontractors to
13  my knowledge.  I mean --
14     Q.     When did Mr. -- how do you pronounce the
15  name, David -- how do you pronounce the last name?
16     A.     Mine?
17            MR. CVEJANOVICH:  Doug.
18            THE WITNESS:  David?  Oh, Doug
19  Couch.
20     Q.     (By Ms. Pelletier)  Couch, when did he
21  pass away?
22     A.     It's been about thirteen or fourteen
23  years.
24     Q.     Did your relationship with Seamless
```

10

```
1      Q.     Were you ever employed by Seamless Metal
2   Roofing in whatever form it took fifteen or eighteen
3   years ago when Janet and Doug were running it?
4      A.     Well, it's confusing because Seamless
5   Metals at the time and, no, I just subcontracted from
6   them.  That's all.
7      Q.     To your knowledge, was your son ever an
8   employee of Seamless Metals?
9      A.     Yes.
10     Q.     When?
11     A.     Well, it's been quite a while.  I don't
12  know exact dates, but he's worked there for -- he
13  worked there for a long period of time before he --
14  but I mean, he's not an employee.  He was a
15  subcontractor, same basis, you know.
16     Q.     Well, no, it's not, sir.  So, I'm going
17  to ask you to listen to my questions carefully.
18     A.     Okay.
19     Q.     There's a distinction between an employee
20  and a subcontractor, do you understand that?
21     A.     Yes.
22     Q.     When you said earlier that you were a
23  subcontractor and not an employee, do you receive a
24  1099 or a W-2?
```

12

```
1   change after Mr. Couch passed away?
2      A.     Yeah.  I left the company for a while.
3      Q.     When was that, what years?
4      A.     Oh, well, just prior to my being -- after
5   he -- what the, when -- I'm trying to think what the
6   dates would be.  If we were partner, I'm saying, I'm
7   going by this from my memory, if we were partners in
8   '01, then it had to be like in '99, I left because I
9   worked for Peter L. Brown for a little over a year.
10     Q.     Then at some point you came to enter into
11  some relationship with Janet?
12     A.     Yes.
13     Q.     How did that come about?
14     A.     Well, Doug had died.  The fellow she had
15  running the company, John Doherty, died.  And so, she
16  asked me to come there and help her, you know, and
17  they had a lot of problems with John Doherty running
18  it and he, you know, did a lot of things that, you
19  know, he took deposits.  Well, I'm not going to go
20  into it, but he did a lot of things that I was not
21  happy with and didn't want anything to do with, and I
22  said, well, if we're going to work together, then
23  there's going to start a new company, you and I, and
24  it's going to be separate from Seamless Metals.  So,
```

1  we formed an LLC, and we call it Seamless Metal

2  Roofing Company, LLC.

3      Q.    Did Mr. Doherty continue to operate some

other business called Seamless Metals?

5  A.    No.  He died.

6      Q.    So, what was the change, you called it

7  Seamless Metal Roofing, LLC?

8  A.    I beg your pardon?

9      Q.    What was the change, you said you wanted

10  to separate it?

11  A.    Yeah.  I changed it to -- I still use the

12  name Seamless because I worked with Doug for

13  twenty-five years to build up the name and this guy

14  worked for a couple years tearing it down, you know

15  what I mean?  So, I wanted to retain some of the

16  residual business.  So, I changed it to Seamless

17  Metal Roofing, LLC because at that point we didn't do

18  anything else.  We didn't fabricate metals.  See,

19  when we were Seamless Metals, we did seamless metal

20  siding as well as roofing.  And at this point, we're

21  just doing roofing, nothing else.

22      Q.    When you came back to start doing this

23  work with Janet, did you sign any agreements with

24  her?

---

14

1  A.    Not really.  I don't think so.

2      Q.    How was this LLC formed, did you go to

3  see a lawyer?

4  A.    No.  I had my accountant write it up.

5      Q.    Your accountant did it?

6  A.    Yeah.

7      Q.    What's your accountant's name?

8  A.    Karen Riccarddelli.

9      Q.    Can you spell that?

10  A.    R I C C A R D D E L L I.  Mouthful.

11      Q.    You have documents somewhere that show

12  when Seamless Metal Roofing, LLC was formed?

13  A.    Well, I can get them from her if you

14  want.  I could have them fax it over to you if you

15  want.  I, if you like, I could call her up now.

16      Q.    Maybe we'll do that at a break.

17  Who besides you and Janet have an ownership interest

18  in Seamless Metal Roofing, LLC?

19  A.    Just us.  That's all.

20      Q.    As of 2001, how many employees did

21  Seamless Metal Roofing, LLC have?

22  A.    We don't have -- we subcontract.  We

23  don't -- we use subcontractors solely.

24      Q.    So, the answer is none?

---

15

1  A.    None.  Right.

2      Q.    How do you determine whether to hire

3  somebody as a subcontractor for Seamless Metal

4  Roofing?

5  A.    How do we determine it?

6      Q.    Yes.

7  A.    If they're qualified, they work, if

8  someone can do the work, be reliable, responsible.

9      Q.    How do you determine if they're qualified

10  and can do the work?

11  A.    By having them come on the job and

12  talking to them first thing and then having them come

13  on the job and do some work, and if they can perform

14  well, then they do it, you know.

15      Q.    Do your subcontractors have to carry any

16  types of licenses in order to perform the work for

17  Seamless Metal Roofing, LLC?

18  A.    No.

19      Q.    Does Seamless Metal Roofing hold any type

20  of license?

21  A.    Yes.

22      Q.    What's the license that you hold?

23  A.    Well, state of Connecticut license.  Want

24  to see it?

---

16

1      Q.    State of Connecticut license to do what?

2  A.    Put up metal roofing.  I assume.  Maybe

3  it says something else.  It's a contractor's license.

4  Home improvement, that's what it says.  Home

5  improvement.

6      Q.    So, I'm going to take a copy of this at a

7  break.  You've handed me a document that says State

8  of Connecticut, Department of Consumer Protection,

9  Home Improvement Contractor, and it says Seamless

10  Metal Roofing Co., not LLC?

11  A.    Well, I checked back with them because

12  that's the card and they said it was listed as LLC.

13  Why it didn't come out on the card, I don't know.

14      Q.    It's your understanding, sir, that

15  Seamless Metal Roofing can utilize this license by

16  hiring contractors who are not licensed to do its

17  work?

18  A.    I don't know that there's any requirement

19  for subcontractors to have a license.  They do have

20  to provide their own insurance and their own

21  workman's comp. and their own liability, but other

22  than --

23      Q.    Do you require that the subcontractors

24  that you hire carry worker's compensation insurance?

---

53

1     A.     I don't know.  That afternoon sometime, I
2  guess, you know.
3     Q.     So, he actually got off the roof and went
4  back on later in the day, correct?
5     A.     I don't know.
6     Q.     How long, about, were you at the site
7  that day the day that your son fell?
8     A.     I told you probably about twenty minutes.
9  It might have been a little bit longer.  Might have
10 been a little bit less.  I wasn't there very long, I
11 know that.  I went there, checked to make sure
12 everything was all right, if they had any questions
13 about anything, the way it was supposed to be done.
14 That's it.
15    Q.     Were you ever inside the building?
16    A.     I went in and talked to -- what's his --
17 the homeowner there for a few minutes, I believe
18 that's that same day.
19    Q.     Where in the building were you?
20    A.     Well, around back.  I didn't really go
21 into it, you know.  There was like a hallway or
22 something, I talked to him there.  I don't know if
23 that was his kitchen or what it was but --
24    Q.     Did you observe any skylight holes cut

54

1  out?
2     A.     No.
3     Q.     And you believe you might have been in
4  the kitchen?
5     A.     I don't really know where it was.  You
6  know, it's hard to remember.  You walk around the
7  back of the house and there was like a little hallway
8  or something there.
9     Q.     I'm going to show you a document and ask
10 you if you can identify that.
11    A.     Yeah.  These are statements from the
12 bank, payments made for different jobs.
13    Q.     Who created that document?
14    A.     What's that?
15    Q.     Who created the document?
16    A.     I don't know.
17    Q.     Did you?
18    A.     I didn't, no.  I assume it would be the
19 bank, right?  Doesn't say.  I don't know.  Possibly
20 Janet, she puts all the stuff on the computer in,
21 what do call it, a Quick Books.  Maybe that's where
22 it came from.
23    Q.     Do you have any knowledge as to what
24 these documents mean, the four pages that is Exhibit

55

1  1?
2     A.     Yeah.  It's -- well, it's a check, the
3  date number, a date, the number of the check, who it
4  was paid to and on what job it was charged to.
5     Q.     That's the first two pages.  What do the
6  second two pages mean?
7     A.     This looks like a bank statement.  I
8  don't really know.
9     Q.     I'm going to show you a document that was
10 previously marked as Exhibit 3 and tell me if you
11 know what that means?
12    A.     These are checks that were paid to Mike
13 Moffit on certain jobs for subcontract wages.
14    Q.     By Seamless?
15    A.     Yeah.  Yes, ma'am.  I don't know what
16 these amounts and balances are at the bottom but --
17    Q.     The top of the document marked as Exhibit
18 3 has a series of checks referenced and the bottom of
19 the document says find report and it just lists a
20 bunch of numbers, is that correct?
21    A.     Yes.
22    Q.     You don't know what the bottom means?
23    A.     No, I don't.
24    Q.     Who if anybody to your knowledge would

56

1  know what these documents mean?
2     A.     Janet Couch.  Or if my accountant printed
3  them out, she would know.  I don't know what the
4  source of the documents are.  They're probably from
5  Karen Riccarddelli because she does our accounting.
6  So, she would have those figures.
7     Q.     Do you have any documents in your
8  possession, custody or control that reflect what jobs
9  you hired Mike Moffit for during the time that your
10 son claims to have been incapable of working?
11    A.     I think that's what these are, isn't it?
12    Q.     You're looking at some documents, sir.
13 Are those the same documents I showed you or are they
14 different documents?
15    A.     Well, I don't know if they're different
16 documents or not.  This is what --
17    Q.     Thank you.
18    A.     These, and then I have these checks
19 because the computer crashed.  So, I don't have --
20 so, Janet dug out these checks.  They're supposed to
21 be for the time period in question.
22           MS. PELLETIER:  Can you mark that?
23           (Exhibit 6, marked)
24    Q.     (By Ms. Pelletier)  The document that's

1  been marked as Exhibit 6 says 2:33 p.m., January 27,
2  2004, in the upper left-hand corner, correct?
3      A.    **Yes.**
4      Q.    What is it that you think that's supposed
5  to represent?
6      A.    **What's that?**
7      Q.    What is it that you think that document
8  is supposed to represent?
9      A.    **These are checks paid to subcontractors**
10 **doing the same work that Robert would have been**
11 **doing.**
12     Q.    Where does it tell me that that's the
13 work that Robert would have been doing?
14     A.    **It doesn't.**
15     Q.    So, what are you basing your statement
16 that that's what that tells me on?
17     A.    **Because Robert was the one who was**
18 **subcontracting their work and these are the people**
19 **that had to do it.**
20     Q.    This is in 2004, this is dated January of
21 2004, correct?
22     A.    **Yeah.  I was asked to bring that here for**
23 **different years.  So, that's why I did.**
24     Q.    Who asked you to bring this?

---

58

1      A.    **John did.**
2      Q.    You're talking about your son's attorney?
3      A.    **What about it?**
4      Q.    You're talking about your son's attorney?
5      A.    **Yes.**
6      Q.    What did he ask you to bring that caused
7  you to come up with this two pieces of paper?
8      A.    **Just, he just asked us to bring**
9  **documentation of whatever readout we had of**
10 **subcontractors we paid in lieu of Robert after he**
11 **left.**
12     Q.    Who is Gary Dew?
13     A.    **Subcontractor.**
14     Q.    He's another subcontractor?
15     A.    **Yes.**
16     Q.    Who is John Turner?
17     A.    **Let me see.  Oh, that won't be relevant.**
18 **You can cross that out.  That wouldn't be relevant.**
19     Q.    Who is he?
        A.    **He is a fellow I had do some gutter work.**
            MS. PELLETIER:  Mark this, please.
                (Exhibit 7, marked)
23     Q.    (By Ms. Pelletier)  The second document
24 that you brought has now been marked as Exhibit 7.

---

59

1  It says find report September 1, 2001, through
2  January 1, 2005, but the dates are all from 2003 and
3  2004.  Is that right?
4      A.    **That's correct.**
5      Q.    So, you didn't bring any printouts for
6  documents that show what happened in October,
7  November of 2001, is that right?
8      A.    **I guess that's when these are.  I think**
9  **she had some problem with the computer.**
10     Q.    She, Janet?
11     A.    **Janet, yes.  I guess these are -- I would**
12 **assume that's what these are.**
13     Q.    For what period of time -- strike that.
14           Was there any period of time that
15 Seamless Metal Roofing had to engage a different
16 subcontractor because your son couldn't work?
17     A.    **Well, after he got hurt, that's why we**
18 **used Mr. Moffit, and then when Mr. Moffit went, I**
19 **used Mr. Dew.**
20     Q.    What period of time was it that you claim
21 you had to use Mr. Moffit because your son couldn't
22 work?
23     A.    **Right after he got hurt.**
24     Q.    Until when?

---

60

1      A.    **I don't know the dates.  Until last year**
2  **sometime, I think.**
3      Q.    Can you explain to me then, sir, why
4  Exhibit 1 shows that you paid Robert Dade on the Gondolfo
5  job on November 16, 2001?
6      A.    **On this first page?  I don't see it.  Oh,**
7  **yeah.  Well, that's what it says.  I don't know what**
8  **that --**
9      Q.    There's no check stub here for that date,
10 would you agree with me?
11     A.    **What's that?**
12     Q.    There's no check stub there for the date
13 that I just asked you about, is that correct?
14     A.    **Isn't that that day, is that the date?**
15     Q.    These are September, sir.
16     A.    **We're looking for what -- what are we**
17 **looking for?**
18     Q.    November 16, 2001.
19     A.    **Not that I can see.**
20     Q.    There's no check stub reflecting a
21 payment to Mr. Moffit either for November 16 of 2001,
22 correct?
23     A.    **There's no check stub in here for that**
24 **period that I can see.**

---

1    Q.    That's the period that you claim that
2  Mr. Moffit had to be hired because your son couldn't
3  work?
5    A.    Well, there's a lot of checks in here
6  that went to Moffit in November, that's doesn't mean
7  the November date you're saying.  These are all made
7  out to Mr. Moffit.
8    Q.    Is there one dated November 16 to
9  Mr. Moffit?
10    A.    No.
11    Q.    Is there one dated November 19 to
12  Mr. Moffit?
13    A.    No, not that I can see.
14    Q.    Is there one dated November 19 to your
15  son?
16    A.    No.
17    Q.    Is there one dated November 23 to your
18  son?
19    A.    Nope, not that I can see.
20    Q.    How about December 5, are there any
21  checks dated December 5 to your son?
22    A.    You say December?
23    Q.    December 5.
24    A.    Nope.

62

1    Q.    How about December 19 to either your son
2  or Mike Moffit?
3    A.    December 6, December 29.  Unless these
4  are not in order or something.  No, there doesn't
5  seem to be any -- some checks are missing here.
6    Q.    So, the checks that are missing --
7    A.    1637, skips to 1639.  So, it's in that
8  period of time.
9    Q.    According to this document that was
10  produced in this litigation allegedly showing
11  Mr. Moffit had to be hired to perform these jobs?
12    A.    Mm-hmm.
13    Q.    The checks that I just asked you about,
14  they're not included in that check register, correct?
15    A.    No, not in this, no.  It must be on that.
16    Q.    And also identified in the document that
17  was produced in this litigation that's been marked as
18  Exhibit 1 is a series of checks written to your son
19  during that same time frame that he claims that
20  Mr. Moffit had to be hired in order to perform work
21  and those checks are not in that register as well, is
22  that correct?
23    A.    Right.
24    Q.    Do you have any knowledge as to where

63

1  those check stubs are?
2    A.    No.
3    Q.    Who pulled those check stubs together for
4  you to bring here today?
5    A.    Janet Couch.
6    Q.    How would your son or Mr. Moffit get
7  paid, how would you calculate how they would get paid
8  on any given job?
9    A.    By the amount they do.
10    Q.    How would anybody know what amount they
11  did, how does that work?  Do they submit a piece of
12  paper that said, I did fifty, 150 square?
13    A.    Generally, generally, generally when they
14  were half done, they were paid, you know, most of
15  their money, and then when they finished, they were
16  paid the balance.
17    Q.    How would anybody know how much they did?
18  They're paid by the square, right?
19    A.    Because they say how much they did or I
20  would go there and see how much they did, you know.
21  Generally, when we're half done, we receive a payment
22  from the homeowner.  That's usually the way it works,
23  one-third down, one-third when we're halfway through
24  the job, and then one-third when we're finished.  So,

64

1  when we're halfway, generally they would get half
2  their money, and when we finish, they would get the
3  rest.  Sometimes they would want money, need money,
4  we'd give it ahead of time.  So, there's variables
5  there, you know.
6    Q.    There was no paper trail of any of this?
7    A.    No, not other than checks.
8    Q.    Which we don't have?
9    A.    Apparently.
10    MS. PELLETIER:  Why don't we take a
11  break and see if you can call your accountant
12  or Janet and see if you can get those documents
13  faxed to us?
14    THE WITNESS:  Okay.
15    (A recess was taken)
16    MS. PELLETIER:  Back on the record.
17    Q.    (By Ms. Pelletier)  Several times when we
18  were on the record and off the record, you've made
19  comments about a computer crashing, is that correct?
20    A.    Yes.
21    Q.    What computer crashed?
22    A.    Well, Janet, what little bit I know about
23  computers, does her books on a Quick Books process
24  which then she then turns over to our accountant, and

79

1  John.

2           (Off record conference)

3           MR. CVEJANOVICH:  Back on the

   record.

5

6      CROSS EXAMINATION BY MR. CVEJANOVICH:

7      Q.      I have before me what's been marked as

8  Exhibit Number 5, and this is the proposal and

9  contract for the house at 169 Worthington Street

10  where your son got hurt?

11      A.      Yes.

12      Q.      Exhibits 3 and 4 are not ones you brought

13  today, those were ones that Attorney Pelletier had

14  here today, correct?

15      A.      Right.

16      Q.      Exhibit 1 was also -- 1 and 2 are also

17  exhibits she had here today, not ones you brought

18  with you?

19      A.      Right.

20      Q.      Numbers 6 and 7, just generally refer to

21  what?

22      A.      These are subcontract wages after Robert

23  was hurt.

24      Q.      Can you just kind of go through each

78

1  column and say what they mean, begin with 6.

2      A.      Okay.  The check, the date it was issued,

3  who it was issued to, what bank and the amount.

4      Q.      Okay.  So, where it says type, the word

5  check indicates to you that a check was written?

6      A.      Right.

7      Q.      The date is the date the check was

8  written?

9      A.      That's correct.

10      Q.      The name, for instance, Gary Dew, is the

11  person who --

12      A.      Right.

13      Q.      -- received the check?

14      A.      Subcontractor, right.

15      Q.      Split, Thomaston Savings Bank is the bank

16  the check was written on?

17      A.      That's correct.

18      Q.      And paid amount is the amount of the

19  check?

   A.      Paid amount.

   Q.      Okay.  Exhibit 7, if you could just go

22  through, and first of all, what generally is referred

23  to in those -- in that exhibit?

24      A.      Well, under the date, there's -- has the

80

1  date it was issued and under the number, number of

2  the check, under name it says the name of the

3  subcontractor, under memo are the job names, under

4  account it says Thomaston Savings, the bank we wrote

5  the checks on, and under split it has subcontractors

6  and the amount, that would be the amount of the check

7  underneath that.

8      Q.      Okay.  So, again, but generally these

9  checks were written to whom for what purpose?

10      A.      These were written to -- these were all

11  written to Mike Moffit for subcontract wages.

12      Q.      Okay.  How do they relate to the

13  accident?

14      A.      Well, we had to hire him as a

15  subcontractor after Bobby got hurt and this would be

16  loss of wages, in other words, wages that he would

17  have had if he was working.

18      Q.      Exhibit Number 8, what's contained in

19  Exhibit Number 8?

20      A.      As I understand it, these are check stubs

21  that Janet Couch pulled out for the period requested

22  that we, you know, the period she -- her computer

23  crashed, and so, she has no computer record of these.

24  So, she has these check stubs.

81

1      Q.      But the information would ordinarily have

2  been -- what would ordinarily have been done with the

3  check information?

4      A.      These are subcontractors or the amount

5  they were written for what job, this says R.J.

6  Matthews final, you know.

7      Q.      Ordinarily, this information in Exhibit

8  Number 8 would have been put on some document similar

9  to Exhibit 6 and 7?

10      A.      Same as that, it would have been put in

11  Quick Books so we'd have it on the computer.

12      Q.      You have one more item here that has not

13  been marked as exhibit.  Can you mark that one?

14           (Exhibit 9, marked)

15      Q.      (By Mr. Cvejanovich)  What's been marked

16  as Exhibit Number 9, what are these?

17      A.      Number 9, these are checks that were

18  written to Robert Joseph Dade but they were paid --

19  we actually paid them to Michael Moffit because this

20  was the checks for the Boland job.

21      Q.      By Boland job, you mean 169 Worthington?

22      A.      That's correct.

23      Q.      Huntington, excuse me?

24      A.      That's correct.

81

1    Q.    169 Worthington Avenue in Huntington,

2  Mass.

3    A.    **Right, because he subcontracted the job.**
**She wrote the checks out to him.**

5    Q.    Okay.

6          MR. CVEJANOVICH:  That's all I have.

7          THE WITNESS:  Okay.

8

9          REDIRECT EXAMINATION BY MS. PELLETIER:

10   Q.    Sir, you testified that the information

11 contained in Exhibit 7 which reflects checks made

12 payable to Mr. Moffit, Mr. Dew from January 9 of 2003

13 through December 28 of 2004 allegedly reflects work

14 that had to be done because your son couldn't do it?

15   A.    **Right.**

16   Q.    Where did you get that information?

17   A.    **What do you mean where did I get that**

18 **information?**

19   Q.    Where did you get the information that

20 that's what that document reflects?

21   A.    **Because my son was subcontracting all the**

22 **work from us and we had to hire these subcontractors.**

23   Q.    Straight through January, 2005, it's your

24 allegation that you had to hire those to replace your

82

1  son?

2    A.    **Well, how else would I do the work?**

3    Q.    Well, sir, I don't know.  Why don't you

4  tell me?

5          MR. CVEJANOVICH:  Just yes or no.

6    Q.    (By Ms. Pelletier)  Because in December

7  of 2001, you were paying your son money, according to

8  the documents that were produced in the course of

9  this litigation?

10   A.    **Mm-hmm.  Yeah.  January.**

11   Q.    According to those documents that were

12 produced in the course of this litigation, sir, your

13 son started receiving checks back in November of 2001

14 through the end of December of 2001.  Did he ever

15 have come back to work for Seamless?

16   A.    **No.**

17   Q.    He never came back to work for Seamless?

18   A.    **No.  Not really.**

19   Q.    He never worked on the jobs that are

20 reflected in the documents that were produced in the

21 course of this litigation?

22   A.    **In this period of time, this is January.**

23   Q.    Do you recall ten minutes ago we went

24 through these documents looking for checks from

83

1  November 19 of 2001, various dates in November and

2  December?

3    A.    Yes.

4    Q.    Where these documents reflected the

5  checks were written to your son?

6    A.    **You lost me, lady.  I'm just giving you**

7  **these documents.  They're computerized documents,**

8  **what dates he was paid, and that's all I can tell**

9  **you, you know.**

10   Q.    You've just testified that those

11 documents reflect something very specific.  You've

12 testified that those documents that you've produced

13 today for the first time, Exhibits 7 and 6, reflect

14 what you called lost wages to your son.  Where did

15 you get that information, that that's what those

16 documents were designed to represent?

17   A.    **I didn't say they were designed anything.**

18 **These are -- this is when he was working.  She just**

19 **ran off what checks were paid to who during this**

20 **period of time.  Now, this says January.**

21   Q.    She meaning Janet handed you those

22 documents and those documents reflect all the checks

23 that were written by Seamless to the various

24 individuals identified, correct?

84

1    A.    **Right.**

2    Q.    You don't have any personal knowledge,

3  sir, as to whether those jobs would have gone to Mike

4  Moffit, your son or anybody else, is that fair to

5  state?

6    A.    **How do you figure that?**

7          MR. CVEJANOVICH:  Just answer the

8          question, okay?

9          THE WITNESS:  No.  I -- if all --

10         put it this way, Bob was subbing all our work

11         until he was hurt, and after that, he couldn't

12         sub it.  So, we hired other subcontractors.

13   Q.    (By Ms. Pelletier)  You hired Mike Moffit

14 at the same time as you hired your son, did you not?

15 The documents right in front of us show you that,

16 don't they?

17   A.    **Mike Moffit was a subcontractor before.**

18   Q.    That's right.  And he was a

19 subcontractor --

20   A.    **What's your point?**

21   Q.    And he was a subcontractor after, right?

22   A.    **Well, this is the work Robert would have**

23 **done.  That's all I'm telling you.**

24   Q.    How do you know that?  How do you know

85

1  Mike Moffit wouldn't have done the work?  Mike Moffit
2  did this job with your son, didn't he?
3      A.    **Yeah.**
       Q.    Okay.
5      A.    **I would have hired him to do it.  Let me**
6  **put it that way.  I don't know what to tell you.**
7  **When Bobby got hurt, he no longer subbed the jobs.**
8  **He was running -- any jobs we were doing, he was**
9  **running them.**
10     Q.    For what period of time do you claim that
11  your son couldn't work?
12     A.    **Well, after he got hurt, he couldn't**
13  **work.**
14     Q.    To this day?
15     A.    **Well, no.  He's -- he can't do this work**
16  **anymore.**
17     Q.    You can't explain to me --
18     A.    **He since has gotten another job where he**
19  **could stay flat on the ground because his foot is**
20  **immobilized.  He couldn't do roofing anymore.**
21     Q.    You can't explain to me then, sir, why
22  the documents produced in the course of this
23  litigation reflect checks paid by Seamless Metal
24  Roofing to your son in the period of November and

87

1      A.    **12/29.**
2      Q.    What's the check number?
3      A.    **2001.  1671.**
4      Q.    To whom was the check paid?
5      A.    **Mike Moffit.**
6      Q.    What was the job?
7      A.    **Dubray.**
8      Q.    Different job?
9      A.    **Yup.**
10     Q.    So, your son on December 29, 2001,
11  according to the documents produced in this
12  litigation, was paid by check number 1673 for working
13  on the Wulford job, right?
14     A.    **That's what it says.**
15     Q.    Okay.  And Mr. Moffit was working on a
16  different job, was he not, according to these
17  documents, he was working on the Dubray job, is that
18  right?
19     A.    **Mm-hmm.**
20     Q.    That's yes, for the record, sir?
21     A.    **Yes.**
22     Q.    Let's go down one, shall we?
23     A.    **Okay.**
24     Q.    On Robert J. Dade which is Exhibit 1, is

86

1  December of 2001 on jobs that mirrored the ones that
2  you claim you had to hire Mike Moffit for?
3      A.    **I don't know.**
4      Q.    You don't know?
5      A.    **No, I don't know.**
6      Q.    You can't explain that?
7      A.    **These are all written out to Mike Moffit.**
8  **Where are you talking about?**
9      Q.    Do you see your son's name on this
10  document marked as Exhibit 1, Robert J. Dade, is that
11  your son or is that you?
12     A.    **Yes, that's him.**
13     Q.    Okay.  Let's start with the top.  What's
14  the date?
15     A.    **It says 12/29/01.**
16     Q.    What's the check number?
17     A.    **1673.**
18     Q.    What's the memo, what does it say for the
19  job?
       A.    **Wulford.**
21     Q.    Say it again.
22     A.    **Wulford.**
23     Q.    Wulford.  Look at Exhibit 4.  What's the
24  date, top number, what's the date?

88

1  that right?
2      A.    **Yes.**
3      Q.    What's the next check number, what's the
4  next date?
5      A.    **16 -- 12/19.**
6      Q.    '01?
7      A.    **Yes.**
8      Q.    Check number?
9      A.    **1656.**
10     Q.    Job, what's the job?
11     A.    **Dubray.**
12     Q.    How much -- strike that.
13           It doesn't tell you how much.
14  December -- what was the date of that, December 19?
15     A.    **Yes.**
16     Q.    Okay.  Let's look at Mr. Moffit.  He was
17  working somewhere else on December 19, was he not?
18     A.    **Mm-hmm.**
19     Q.    According to Exhibit 4, sir, where was he
20  working on December 19?
21     A.    **Yeah.  That's 12/29, same date.**
22     Q.    December 19, we went down one, December
23  19, check number what?
24     A.    **1655.**

89

| | | |
|---|---|---|
| 1 | Q. | Different check number, correct? |
| 2 | A. | **Right.** |
| 3 | Q. | Different job, correct? |
| | A. | **Correct.** |
| 5 | Q. | So, the documents that were produced in |

the course of this litigation show that your son was
being paid to work a different job than Mr. Moffit
was working during November and December of 2001,
correct?

10    A.    **Well, both say the same thing, Gilhewey,**
11  **Dubray, Dubray.**
12    Q.    Not on the same dates, correct?
13    A.    **Not on the same date, no.**
14    Q.    They're different check numbers?
15    A.    **Yes.**
16    Q.    They were paid to two different people?
17    A.    **Right.**
18    Q.    Mr. Moffit and your son?
19    A.    **Right.**
20    Q.    But you're telling me your son never came
21  back to work and never worked for Seamless, right?
22    A.    **As far as I know.**
23    Q.    How do you explain this?
24    A.    **Well, I don't have any idea.  He stayed**

90

1  around for a while, worked with him, I guess.  He
2  **didn't work really because he couldn't work.**
3    Q.    But you paid him anyway?
4    A.    **Apparently.**
5              (Exhibit 8, marked)
6    Q.    (By Ms. Pelletier)  By the way, none of
7  those check stubs are included in the document that's
8  been marked as Exhibit 8, right, those are the ones
9  you were looking for earlier?
10    A.    **Not that I know of.  Doesn't look like**
11  **it.**
12    Q.    You testified that these check stubs that
13  show that your son was paid in connection with the
14  Boland job?
15    A.    **Yes.**
16    Q.    Mr. Moffit was really paid?
17    A.    **Yes, that's what I was told.**
18    Q.    By whom?
19    A.    **By Janet Couch.**
20    Q.    So, she wrote in the check registers that
21  she wrote a check to your son but she paid
22  Mr. Moffit?
23    A.    **No.**
24    Q.    Then explain that one to me.

91

1    A.    **Paid this job off through my son, the**
2  **Boland job through my son because he started it.  But**
3  **Mr. Moffit had to finish it anyway.**
4    Q.    So, you did pay your son, Seamless Metal
5  Roofing paid your son for the Boland job, correct?
6    A.    **Well, indirectly, yes.**
7    Q.    What do you mean indirectly?  I'm looking
8  at check stubs to Robert J. Dade?
9    A.    **Yes.**
10    Q.    You paid them directly?
11    A.    **Well, he in turn paid -- well, you have**
12  **to discuss that with him, but he in turn paid**
13  **Mr. Moffit.**
14    Q.    Okay.  You don't have any personal
15  knowledge of what happened after this money was paid
16  by Seamless --
17    A.    **No.**
18    Q.    -- to Robert J. Dade?
19    A.    **No.  No.**
20    Q.    When you go and price a job, do you ever
21  question the contractors to what if any experience
22  they have to installation of metal roofing?
23    A.    **Contractors?**
24    Q.    The general contractor on the site, do

92

1  you ever --
2    A.    **No.**
3    Q.    -- have any conversations with them about
4  the installation -- their knowledge of the
5  installation of metal roofing?
6    A.    **Not really, no.  Sometimes, I mean, they**
7  **ask, they want to put up a different system, and I**
8  **explain this system to them, that's all.**
9    Q.    Do you have any knowledge as to whether
10  Mr. Boland had ever had any experience with
11  installation of metal roofing prior to this project?
12    A.    **No.**
13    Q.    Would it have mattered to you?
14    A.    **No.**
15    Q.    That's because you guys are the experts
16  at installation of the metal roof, not the general
17  contractor, correct?
18    A.    **Well, we know how it goes on.  They**
19  **don't.  Yes, okay.  Well, I mean, they have to have a**
20  **general knowledge of it.**
21    Q.    Why?
22    A.    **Why else would they want to have a roof?**
23    Q.    Mr. Boland didn't want a metal roof, the
24  Joneses wanted a metal roof?